## DOCK BAINES v. THE STATE.

### No. 2430. Decided February 19, 1902.

**1.—Disqualification of Judge.**

The fact that the trial judge, before his elevation to the bench, had been asked what fee he would charge to prosecute defendant, and he simply stated the amount of the fee he would take, which was never arranged or agreed to be paid, and he gave no advice as to the case and had nothing further to do with it, this did not constitute him an employed attorney in the case and did not disqualify him from afterwards trying the case as a judge.

**2.—Assault with Intent to Murder—Remote Evidence.**

On a trial for assault with intent to murder, where it appeared that defendant had some considerable time prior thereto been attempting to seduce the injured female, evidence tending to show his motive, though remote, if connected or manifesting any bearing upon the issue being tried, was admissible, its weight being matter for the jury.

**3.—Same—Evidence.**

On a trial for assault with intent to murder, it was admissible to prove by the prosecutrix that she found oil poured upon some of her clothing, when the defendant was the only person at the house at the time, and the circumstances tended strongly to show that he did it.

**4.—Animus of Witness Towards Defendant.**

Where a witness is asked as to her feeling towards defendant, and her testimony on the matter is noncommittal, no injury is shown.

**5.—Bill of Exceptions to Admitted Testimony.**

A bill of exceptions to testimony showing that the prosecutrix was brought twice before the grand jury, which does not show what she testified to on either occasion, will not be reviewed.

**6.—Assault to Murder—Evidence.**

On a trial for assault with intent to murder, which was committed by shooting at night, it was competent to show that the ground near the house appeared on the next morning to have been disturbed as if some one had been there, and

it was not necessary to the admission of this evidence that testimony identifying defendant's tracks at the place should have first been adduced.

**7.—Same—Evidence—Conduct of Defendant.**

On a trial for assault with intent to murder, it was material and competent to prove that, on the morning after the shooting, defendant failed and refused to assist the neighbors in searching for tracks and other incriminating evidence which might lead to the detection of the guilty party.

**8.—Same—Evidence as to Tracks.**

It is not essential to the admission of evidence of similarity of shoe tracks, that the tracks should have been measured by the witnesses; it is competent for the witnesses to state that they appeared to be similar and looked to be the same size as those made by defendant.

**9.—Same—Evidence.**

On a trial for assault with intent to murder, it was competent to show the character of shot found in and taken from the pocket of the pants of defendant at his house.

**10.—Same.**

On a trial for assault with intent to murder, where a piece of paper, which was identified as the same that had been turned over to the district attorney, was exhibited in court to a witness, it was competent for the witness to state that it looked like the same piece of paper, and he believed it was, and took it to be the same piece of paper that was taken from defendant's pants pocket at his residence on the morning after the shooting.

**11.—Same—Evidence as to Defendant's Motive.**

On a trial for assault with intent to murder, where defendant had attempted to show by the witness, who was his father-in-law, and also father of the prosecutrix, that there was no motive for his shooting the latter, because the best of feeling had always prevailed between the witness and his family and defendant, it was competent to prove by the witness that he and defendant had previously had some differences.

**12.—Same—Evidence as Tending to Identify Defendant.**

On a trial for assault with intent to murder, which was committed on a warm, dry, midsummer night, it was competent, as a circumstance tending to show that defendant committed the deed, to prove by a witness that on the morning after the shooting, and at defendant's house, which was three miles from the scene of the shooting, the witness found defendant's shirt hanging in his room, and it was damp. This evidence tended to show that defendant must have walked rapidly from the scene of the shooting to his house.

**13.—Same—Evidence of the Feelings of Prosecutrix Towards Defendant.**

On a trial for assault with intent to murder, where the State had introduced a number of circumstances tending to show defendant's attempt to seduce the prosecutrix, it was competent to show that the state of feeling was not good on her'part towards him, especially as the prosecutrix showed herself to be a reluctant witness.

**14.—Same—Statements of Defendant.**

On a trial for assault with intent to murder, where the defense was an alibi, and where, after defendant's arrest and he had been properly warned by the officers as to any statement he might make, his statement that ."on the night of the shooting he was at home by himself, and how could he prove out of this business, that he did not shoot the girl, but who can he prove it by, when there was nobody at home but himself," was relevant, pertinent, and admissible in evidence to meet the defense of alibi and show that it was fabricated.

**15.—Same—Identification of Defendant.**

On a trial for assault with intent to murder, it was competent to prove by prosecutrix and another female that some time before the shooting defendant came into the room where they were sleeping, and that one of them identified him by his broken arm, which he was carrying in a sling.

**16.—Argument of Counsel—Allusion to Former Conviction.**

While the statute, Code of Criminal Procedure, article 823, would appear to

prohibit the barest allusion to a former conviction, yet where it is evident there was no intention to allude to it, and the matter connected with such former conviction was referred to incidentally and for no ulterior purpose, it ought not to afford ground for reversal. In this instance the attorney was referring to the affidavit of a witness attached to the motion for new trial on the former trial.

Appeal from the District Court of Erath. Tried below before Hon. W. J. Oxford.

Appeal from a conviction of assault with intent to murder; penalty, three years imprisonment in the penitentiary.

This is the second appeal in this case, and a sufficient statement of the essential facts may be seen by reference to the former appeal. Baines v. State, 42 Texas Criminal Reports, 510. The questions discussed in the opinion on this appeal are so fully stated as to need no further statement concerning them.

*Daniel & Keith,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of an assault with intent to murder, and his punishment assessed at confinement in the penitentiary for three years. This is the second appeal; the former appeal being reported in 42 Texas Criminal Reports, 510, 1 Texas Court Reporter, 816. The facts on this trial are substantially the same as on the former trial, except several witnesses testified on this trial who did not testify on the former. But the State's theory and the defendant's were the same on both trials.

In the motion for new trial, appellant, for the first time, raises the question as to the qualification of the judge to try the case; the ground of disqualification, as urged by him, being that the judge, before he came on the bench, was of counsel in the case. To support this motion, appellant relied on the affidavit of J. O. Freeman, who testified, in effect: That he went to the office of W. J. Oxford to employ him. After consulting with him in regard to the case he made a contract with him as to what his fee would be to assist in the prosecution of defendant, and $75 was agreed on as the fee. That the said Oxford advised affiant that he thought defendant could be convicted of making an assault in disguise, and defendant given a heavy penalty for the offense. That said Oxford advised affiant that he believed defendant guilty, and could prosecute defendant to conviction, and that, after relating to Oxford the circumstances against defendant, the said Oxford advised affiant as aforesaid; that afterwards affiant was advised not to employ private counsel to prosecute defendant, and he failed to pay said Oxford the fee agreed upon, and let the matter drop. The State controverted the grounds of disqualification, introducing witnesses who were present at the alleged transaction between said J. O. Freeman and W. J. Oxford, to wit, W. J. Oxford, Eli Oxford, and Lee Oxford, the

latter not being related to the judge. These witnesses flatly deny the employment of said Oxford as an attorney. They state, in effect, that Freeman was drinking at the time he came into Oxford's office, and spoke about employing him; asked what he would take as a fee, and he replied $100. Freeman then said that his neighbors proposed to help him raise the fee if they could agree on it, and that Oxford then told him he would take $75 if the fee was made up in that way; that Freeman may have told Oxford something about the case. Oxford himself did not remember that Freeman told him he knew appellant was guilty of that offense and guilty of burning his barn, and wanted him prosecuted; that he gave no advice about the case, and that Freeman never returned to employ him; that some time afterwards, he asked him about it, and he said that he had conferred with the district attorney, who said he did not need any help to prosecute the case; that he had dropped the matter. The other two witnesses corroborate the judge in his statement. The State also introduced Dr. Burger, who testified that some time after Freeman's daughter was shot he had three different conversations with him about employing Judge Oxford. In the first conversation Freeman told him the neighbors were going to make up the money to pay an attorney; the next time Freeman told him he did not know about it, and the last time he said positively he had not and was not going to employ an attorney, but was going to let the case take its course. In addition to this, the State introduced a number of witnesses who testified that the reputation of J. O. Freeman for truth and veracity was bad. On this state of case the court thought he was not disqualified, and refused to recuse himself. Appellant insists that, under the rule laid down in the Graham case, ante, page 110, 2 Texas Court Reporter, 821, the judge was disqualified to try the case; the only ground of similarity being that the matter of fee was discussed in both, but no fee ever paid. In the Graham case it was shown by appellant that Judge Goodman consulted with other attorneys of appellant in regard to the case. We do not understand that the judge, in his testimony, denied consulting with appellant's attorneys, but stated, however, that he considered the consultation rather as a friend of one of the lawyers who was related to appellant, than as an attorney in the case. He admitted that he went to the jail to see appellant, and did not deny that appellant may have there talked to him about the case, but stated, if he did so, that it was voluntarily made by him without any consultation or even inquiry on his part; that he went there for the purpose of arranging the fee. In this case, the witnesses for the State testified emphatically that there was no employment and no advice given; that at most there was only, on the part of the judge, a proposition to take a certain fee, but this fee was never arranged or agreed to be paid. On this state of facts we do not believe this case comes within the rule as laid down in Graham's case, supra. If it be conceded that Freeman's testimony showed an employment and advice given, this was contradicted, and his testimony overwhelmingly controverted by that offered on the part of the State.

If a judge could be disqualified on this character of evidence, then, if every case where an attorney should be spoken to, and in response to the question of fee, should state what amount he would take to prosecute or defend a case, and such attorney should afterwards be elected judge, and what had previously transpired should afford a ground of disqualification, it would follow in order to disqualify a judge, it would only be necessary to show that he had previously been asked what he would prosecute or defend the case for. We do not believe that any case has gone to that extent. There was no error in the refusal of the trial judge to recuse himself.

Appellant, by his first bill of exceptions, raises the question as to the admissibility of the testimony of Minnie Freeman, to the effect that on one occasion, as she returned with appellant from a fortune-teller, whither they had gone, appellant offered to put his arm around her waist, and put his arm on the back part of the buggy, but never said a word. This was objected to by appellant, on the ground that it was too remote from the time of the shooting to show any motive whatever. It might be replied to this bill, in the first place, that it does not state the time when this occurred, accordingly we can not tell how remote it is. That it was admissible, as showing motive, if not too remote, we do not understand to be questioned. The motive relied on here by the State, as we gather from the record, was an attempt on the part of appellant to seduce prosecutrix, Minnie Freeman, who was a girl about 16 or 17 years old at the time, and the sister of his wife. The records tend to show that his attempt in this direction extended over a considerable lapse of time. Evidence tending to show motive, though remote, if connected or manifesting any bearing upon the issue, was admissible, its weight being a matter for the jury. Dell v. State, 1 Texas Crim. App., 268; Jones v. State, 4 Texas Crim. App., 436; Rucker v. State, 7 Texas Crim. App., 549; Early v. State, 9 Texas Crim. App., 476.

The objection to the testimony of Minnie Freeman to the effect that she found some of her clothing with oil poured on it was not well taken. The circumstances tend strongly to show that this was done by appellant. From the evidence of both Minnie and her sister Lena, appellant was the only person at the house at the time; the other members of the family being in the field at work, or away from home.

Over appellant's objections, the State was permitted to show by Minnie Freeman the state of feeling existing between her and appellant. That is, the State asked the witness what the state of feeling was between her and defendant, and she replied: "It is just like it has always been. If he is the one that shot me, it is hard; if he ain't, it ain't. If he is the one, I want him to suffer for it; and, if he ain't, I don't." The objections to this are that it was immaterial to show the state of feeling between appellant and the witness. The court explains this by showing that the witness was hostile toward the State. Under these circumstances, we think it was proper for appellant to have asked the question, and to have proved directly by the witness what her feelings

toward defendant were, but we do not understand the witness to so testify. Indeed, her testimony is of a noncommittal character, and we fail to see how it could injure appellant.

It is shown that appellant objected to the State showing that the witness Minnie Freeman was brought before the grand jury after she had formerly testified before that body. It is not shown, however, what she testified on either occasion, so the bill is not in a condition to be revised.

We have no doubt that it was competent to show that the ground near the house appeared on the next morning to have been disturbed, as if some one had been there. It was not necessary to identify appellant's tracks there, and show that he had disturbed it, before such evidence could be adduced. It was merely necessary to show that the signs indicated some one had been there.

Witness Gordon testified that while they were looking for tracks, in order to determine who the guilty party was, defendant did not help them to hunt for tracks or anything. This was objected to simply on the ground that it was not material. It occurs to us that this objection is not well taken. Indeed, the bill does not disclose the circumstances or conditions under which appellant was called on to help look for tracks, and in that respect it is defective. However, his failure to assist the parties who were searching for evidence might, under circumstances, be very material as a criminative fact against him. His sister-in-law had been shot the night before by a would-be assassin. The neighbors were engaged in the search to find evidence which might lead to the detection and punishment of the guilty party. If he was called on under such circumstances to aid them, and refused, it might be a circumstance against him; or if he was not called on, but, without assigning any reason, failed or refused to assist his neighbors in searching for evidence, then such failure might become an inculpatory circumstance.

By bills of exceptions numbers 7 and 9, appellant called in question the action of the court permitting certain witnesses to state as to the similarity of tracks found between the place of the shooting and appellant's house with those of appellant's tracks. The witnesses merely state that the tracks looked to them to be the same; that they did not measure them; they looked like appellant's. This testimony was objected to because no measurement was made of the tracks, and consequently there was no certainty that it was the track of appellant, and the testimony was irrelevant and immaterial. We think the objection that no measurement was made by these witnesses of the tracks would go rather to the weight than to the admissibility of the testimony. If the tracks appeared to the witnesses to be similar, and they looked to be the same size as those made by appellant, then the evidence would be admissible. See authorities cited on page 688, subdiv. "D," White's Ann. Code Crim. Proc. Besides, the court, in its explanation, shows the tracks were sufficiently identified.

In our opinion, it was competent to show the character of the shot taken out of the pocket of appellant's pants at his house. The witness shows they were taken out of the pants pocket of Baines, at his home; that the pants were in the cradle, near the little bed there. The objection that the pants were not better identified is not well taken. The witness stated that they were Baines' pants.

We also believe, that it was competent for the witness Joe Gordon to testify that the piece of paper exhibited to him in court looked like the same piece of paper that was gotten at Baines' residence on the morning after the shooting, and he believed it was the same piece of paper; that he took it to be the same piece of paper. The fact that he could not state positively that it was the same paper would not render the evidence inadmissible. The paper is shown to have been taken from the pants pocket of the defendant; and it was further identified as the piece of paper turned over to Harve Keith, and by Keith handed to the district attorney.

The State proved that the witness J. O. Freeman, father-in-law of appellant, had previously had some differences with appellant. This was objected to on the ground that it was immaterial. The court explains this by stating that defendant had proved by the witness that the best of feeling had always prevailed between himself and family and defendant, and that thereafter, on cross-examination, the State was permitted to prove the matters set out in the bill. That is, as we take it, defendant attempted to show by this witness there was no motive for appellant shooting Minnie Freeman, daughter of witness, on the ground that good feeling existed between all the parties. Therefore it was competent to prove that differences existed between them. However, if we look to the testimony of this witness himself, it is favorable to defendant, because he testified that all of the differences had been amicably adjusted. It could not prove hurtful to him.

The State was permitted to prove by Mrs. Freeman that on the morning after the assault and shooting of Minnie Freeman at her house, which was some three miles from appellant's house, she found appellant's shirt hanging in his room; that it was damp. It occurs to us that this was a material circumstance against appellant. The shirt was identified as his; it was damp on the morning after the shooting, the shooting having occurred about 8 o'clock the night before. This was on the night of the 8th or 9th of August, midsummer. The weather was evidently warm, and if appellant did the shooting he walked from his house some three miles to the house where prosecutor lived; and after the deed was accomplished he must have gone rapidly from there back to his home. Evidently the clothes he wore would show some evidence of the trip, and we regard the fact that his shirt was found hanging in his room the next morning in a wet or damp condition as a material circumstance against him.

The State was permitted to show by Mrs. Freeman that prior to the shooting the feeling between Minnie Freeman, her daughter, and appel-

lant, was bad; that she had known for some time that Minnie did not like Baines. This was objected to on the ground that it was not shown defendant knew of this state of feeling, if it existed. The court explains the introduction of this testimony as follows: That the defendant had proved by this witness that he had always been very kind to the entire Freeman family, buying them books, clothes, and other things; and that this kind of feeling prevailed between the members of the family and defendant; and on cross-examination the State was permitted to interrogate the witnesss as set out in the bill. We think, aside from the court's explanation, that it was competent for the State to show the feeling existing between Minnie Freeman and defendant was not good; that she did not like him. It will be borne in mind that the theory of the State was that appellant shot Minnie Freeman because she would not yield to his wishes; and on this line the State introduced a number of circumstances tending to show an attempt on the part of appellant to seduce Minnie Freeman, such as his attempt to put his arm around her waist on one occasion when they were alone together, and his proposition to buy her dresses and to furnish her a horse and buggy if she would run away with him; and but a short time before the shooting, when appellant took her with his family on a trip, he went to her bed, where she was sleeping with his wife, evidently for the purpose of tampering with her, as the evidence shows that she remonstrated and told him if he did not let her alone she would awaken his wife. In connection with all these circumstances, we think it was competent to show that the state of feeling was not good on her part toward him, especially as she showed herself to be a reluctant witness.

If there was anything in the talk between the witness McCoy and the witness Smith at a former term of the court, the bill does not make it manifest. This conversation is not stated between these parties, and is not in a shape to be revised. We believe it was perfectly competent for the State to prove, as was done by the witness Harve Keith, that he warned defendant after he had arrested him, and that he told him that anything he might say to him (witness) could be used and might be used against him as evidence. This warning we think was adequate, and authorized the statement of appellant, made thereafter, "that on the night of the shooting he was at home by himself, and how could he prove out of this business; that he did not shoot the girl, but who can he prove it by when there was nobody at home but himself." This testimony was relevant as a declaration of appellant, after he had been duly warned and pertinent to meet the defense of alibi set up by him, showing that his alibi was an afterthought and fabricated, because by this testimony he was shown to be at home by himself.

It occurs to us that the identity of defendant as being in the room where Lena Freeman and Minnie Freeman were sleeping, sometime in June, 1900, before the shooting, was sufficiently shown to authorize this testimony. True, the witnesses identify appellant by his broken

arm, and having it in a sling, but it seems that this was his condition at that time. These observations would also cover the next bill with reference to the testimony of Minnie Freeman on the same subject; although she did not know who it was, her companion, it seems, did identify him by his broken arm.

Appellant complains that F. H. Chandler, an attorney for prosecution, used the following language in his speech to the jury: "The witness McCoy stands ready to do anything that he is called on to do in this case. According to his own testimony he signed a ready made affidavit sent to him by defendant's counsel, and there is no evidence that McCoy dictated the affidavit or knew what he was expected to swear to until the date he signed and swore to it, without altering or changing the same in any particular." Here search was made by counsel among the papers of the case, and the district attorney was asked for the affidavit referred to, and informed counsel that the same was lost. And then said Chandler said to the jury: "Anyhow, gentlemen, I refer to the affidavit of the witness McCoy, attached to the motion for new trial." This language was objected to by defendant's counsel on the ground that the State was referring to the fact that defendant had before been tried, and that he had applied for a new trial. We presume that appellant seeks to avail himself of the inhibition contained in article 823, Code of Criminal Procedure, which provides, that "the former conviction shall be regarded as no presumption of guilt; nor shall it be alluded to in the argument." While strictly construed, the statute would appear to prohibit the barest allusion to a former conviction, yet we do not take it that this would constitute reversible error. Campbell v. State, 35 Texas Crim. Rep., 160; Brantly v. State, 42 Texas Crim. Rep., 293. Evidently the intent and purpose of the statute was to guard appellant against the use by the State of his former conviction as an evidence of his guilt, and it may be that any intentional allusion to a former conviction ought to afford ground for reversal; but where it is evident there was no intention to allude to a former conviction, and the matter was referred to accidentally and for no ulterior purpose, in such case it ought not to afford ground for reversal. In this particular case the record incidentally shows on the examination of witnesses that there had been a former trial, yet that it is not considered ground for reversal, and the jury were as well informed of the former trial by that means as by the mere reference to the former trial which appears to have been accidental on the part of counsel.

We have examined the record carefully in this case, and, in our opinion, there is no such error as should cause a reversal. The facts amply support the verdict, and the judgment is affirmed.

*Affirmed.*