# THE STATE v. JOE CONCELIA, Appellant.

**Division Two, May 20, 1913.**

1. **CONVICTION: Two Necessary Things.** To justify a conviction on circumstantial evidence two things are required: first, the *corpus delicti*, and second, the defendant's guilty agency in the crime. And in this case the facts show murder of an unknown man beyond doubt and for the purposes of robbery.

2. ————: **Sufficiency of Evidence: Defendant's Evasions.** In this case defendant's own evasions, denials, contradictions and false statements are the most damning indications of his guilt.

3. ————: ————: **Attempts to Divert Suspicion.** An attempt by an accused, when search is being made for the murderer of the unknown man, to direct suspicion from himself; false statements as to his whereabouts; first a denial and afterwards an admission of incriminating facts; and a failure to account for himself at the time of the crime, are circumstances from which guilt may be deduced.

4. ————: ————: **Motive.** In a case of murder of an unknown man, where the evidence is wholly circumstantial, the presence of motive is of paramount importance. But where defendant's agency or participation in a crime is otherwise sufficiently established, lack of motive is of no great moment. In this case some evidence of motive is apparent, and it is that deceased and defendant were in the same room at about two o'clock at night, and deceased there paid $3.20 to its inmates in coin, and exhibited a pocket-book in which were paper bills, which were seen by others, but there is no evidence that defendant did or did not see them; they left the house together at about three o'clock, and at 5:35 deceased was found robbed and dead from a stab in the lung and a pistol shot in the brain.

5. **CIRCUMSTANTIAL EVIDENCE: Instruction: Flexible Rule.** The quantum of circumstantial evidence which suffices to meet the requirements of the rule that the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and so inconsistent with any reasonable hypothesis of innocence as to exclude every rational hypothesis except that of guilt, differs in different cases. In the very nature of things, the formulation of a hard-and-fast fixed rule is precluded. In this case the possibility of defendant's innocence rests upon an unreasonable hypothesis.

6. **SUFFICIENCY OF EVIDENCE: Attitude of Appellate Court.** Before the Supreme Court will reverse a judgment on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is that the verdict is the result of passion, prejudice or partiality. Where there is a bare possibility that defendant is innocent, the court will not reverse the judgment.

7. ————: **This Case.** The evidence in this case, which is wholly circumstantial, is carefully considered, and is *held* sufficient to support the verdict of murder in the second degree.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

AFFIRMED.

*James Fairweather* for appellant.

The evidence is not sufficient to sustain the verdict and judgment of the court. (a) The evidence fails to establish the *corpus delicti*. Wills on Circum. Ev. (Ed. 1905), p. 297; State v. Francis, 199 Mo. 671; State v. Johnson, 209 Mo. 346; State v. Jones, 106 Mo. 313; State v. Knows, 90 Mo. App. 240; State v. Baker, 144 Mo. 323; State v. White, 189 Mo. 339; State v. German, 54 Mo. 526; Yalooski v. State, 82 Wis. 580; State v. Gragg, 122 N. C. 1082; Abbott v. Com., 42 S. W. (Ky.) 344; State v. Millmeier, 102 Iowa, 692; Harris v. State, 19 Am. St. 837. (b) The evidence fails utterly to establish the guilt of the defendant or to connect him in any way with the crime charged, and indicates that the jury were actuated by passion and prejudice. State v. Francis, 199 Mo. 671; State v. Johnson, 209 Mo. 346; State v. Morney, 196 Mo. 43; State v. Crabtree, 170 Mo. 642; State v. Nesenhener, 164 Mo. 461; State v. May, 142 Mo. 152; State v. Heusack, 189 Mo. 295; State v. Glahn, 97 Mo. 692; State v. Scott, 177 Mo. 665; State v. Bartlett, 170 Mo. 658; State v. Wickiser, 177 Mo. 674; State v. Tilley, 90 Va. 99. There is not a scintilla of evidence that the defendant was with deceased after

leaving him at Fifth and Grand avenue. The mere circumstance that deceased was found near where defendant had visited relatives, is not sufficient to convict.

*John T. Barker,* Attorney-General, and *William M. Fitch,* Assistant Attorney-General, for the State.

(1)   Defendant claims the court erred in not instructing the jury on all of the questions of law arising under the evidence in this case; he did not offer or request any definite instruction, and he did not suggest to the court that the court should instruct upon any specific ground on which the court had failed to instruct. The general allegation in a motion for a new trial is not sufficient to raise the question. State v. Conway, 241 Mo. 271; Secs. 5244 and 5245, R. S. 1909. The only exception to the above rule is in a case where there has been a failure to instruct the jury upon a question which goes to the fundamental rights of the defendant. State v. Conway, 241 Mo. 271; Sec. 5231, R. S. 1909. (2)   When the evidence is sufficient to support a verdict then it becomes the peculiar right of the jury to consider and pass upon: (a) The weight of the evidence: State v. McDowell, 214 Mo. 343; State v. Sassaman, 214 Mo. 738; State v. Devorss, 221 Mo. 477; State v. Shelton, 223 Mo. 141; (b) the credibility of the witnesses: State v. Wooley, 215 Mo. 687; and (c) to determine all conflicts in the evidence: State v. Sharp, 233 Mo. 295. If there is any evidence to support the verdict in this case, then under the various cases above mentioned this judgment must be affirmed. (3)   Is the evidence sufficient to support the verdict? That is the only serious question in this case. State v. Nesenhener, 164 Mo. 461; State v. Crabtree, 170 Mo. 642; State v. Gordon, 199 Mo. 561; State v. Francis, 199 Mo. 671; State v. King, 174 Mo. 647; State v. Mahan, 138 Mo. 112; State v. Marshall, 47 Mo. 378. (4) Before this court will relieve on the ground that the verdict is

not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is that the verdict is the result of passion. State v. Howell, 100 Mo. 659; State v. Orr, 64 Mo. 345; State v. Dickson, 78 Mo. 447; State v. Howell, 117 Mo. 346; State v. Lackland, 136 Mo. 32; State v. Miller, 156 Mo. 76; State v. Foley, 144 Mo. 620; State v. Tettaton, 159 Mo. 354; State v. Barrington, 198 Mo. 23. (5) In circumstantial evidence, proof to sustain a conviction must show: First, the criminal act, the *corpus delicti;* second, the defendant's guilty agency in its production. State v. Crabtree, 170 Mo. 650; State v. Jones, 106 Mo. 312; State v. Dickson, 78 Mo. 447; 3 Greenleaf Ev., sec. 30; Wharton Crim. Ev., sec. 325; 4 Elliott Ev., sec. 2708. (6) "It is a fundamental principle of the law of circumstantial evidence that each independent fact must be proved in the same satisfactory manner as if the whole issue rested upon the proof of that fact. Com. v. Webster, 5 Cush. 285; 1 Starke Ev., 510." State v. Crabtree, 170 Mo. 654. (7) If it appears that defendant had no motive for this murder, then that is a circumstance in favor of defendant. State v. David, 131 Mo. 397; State v. Crabtree, 170 Mo. 651; 4 Elliott on Evidence, sec. 2719, n. 79; 12 Cyc. 149. The only motive suggested in this case is that of robbery. (8) In a criminal case, based solely on circumstantial evidence, to justify the inference of guilt, the acts and circumstances should be consistent with each other, and with the guilt of the defendant, and inconsistent with any reasonable hypothesis of the innocence of defendant. State v. Moxey, 102 Mo. 388; State v. Hendricks, 172 Mo. 654; State v. Taylor, 111 Mo. 538; 4 Elliott on Evidence, sec. 2709. Other states have announced the same rule. People v. Fitzgerald, 156 N. Y. 258; People v. Nelson, 85 Cal. 430; State v. Miller, 9 Houst. 564; Cavender v. State, 126 Ind. 47; State v. Johnson, 19 Iowa, 234; James v. State, 45 Miss. 579; State v. Milling, 35 S. C. 25; 3 Ency. Ev. 92,

par. 2, n. 91; 3 Greenleaf Ev., sec. 137. (a) It is also held that circumstantial evidence in a criminal case is of no value if the circumstances are consistent with the hypothesis of innocence or the hypothesis of guilt. Andrew v. State, 42 S. E. (Ga.) 476; State v. Flanagan, 26 W. Va. 116; Pogue v. State, 12 Tex. App. 283. (b) It may be a fact that a crime will be shrouded in mystery if a verdict of guilty is not returned; but such fact cannot justify a verdict of guilty. Schusler v. State, 29 Ind. 394; Webb v. State, 73 Miss. 456; State v. Fahey, 54 Atl. (Del.) 690. (c) It is not sufficient that the facts create a strong suspicion against the defendant. France v. State, 68 Ark. 529; Laws v. State, 114 Ga. 10; State v. Clousser, 69 Iowa, 313; Silvey v. State, 36 S. E. (S. C.) 608; Davis v. Comm., 99 Va. 838; Leisenberg v. State, 60 Neb. 628. (d) Nor that there arises from the evidence a strong probability of defendant's guilt. Wharton v. State, 73 Ala. 366; People v. Dick, 32 Cal. 213; Algheri v. State, 25 Miss. 584; Dreesen v. State, 38 Neb. 375.

FARIS, J.—Defendant was charged by information in the criminal court of Jackson county with murder in the first degree, for that, as is charged, he had killed an unknown man, designated in the information as John Doe. The jury having found him guilty of murder in the second degree and having assessed his punishment at imprisonment in the penitentiary for twenty years, he prosecutes this appeal.

The facts in this case are few and simple, and upon the facts alone the case must stand or fall. On the night of March 23, 1912, at Kansas City, there was a snow of great depth, varying in that behalf, as the witnesses aver, from eighteen to twenty-four inches. On the morning following, at an early hour, an unknown man was found dead on the sidewalk in front of 542 Campbell street, this point being near Missouri avenue, on which avenue certain flats, which play an important

part in this tragedy, were located. An examination of the body revealed three wounds, two of which were in their nature mortal. One of these wounds was on his left side, seemingly from the cut of a large, sharp knife, which penetrated the lung and produced a hemorrhage from which, evidently, the man had died. One of the gunshot wounds was in the face of the unknown man, evidently penetrating the brain, and was in itself alone sufficient to cause death. Deceased was dressed roughly; his coat was of heavy duck or canvas, fleece-lined with sheep skin; he wore felt boots over which heavy rubber overshoes were drawn. His pantaloon pockets were turned inside out and no money or evidences of identity were found on him. His condition indicated that the motive for his killing was robbery. The finding of the unknown; the manner of his death and the inability, which still persists, to identify him, constituted a mystery, which induced much comment in the papers of Kansas City for a number of days. The police investigated, but for more than a week were unable to obtain any information of the man or of the manner of his death. About the 5th of April they were informed that the deceased, in company with defendant, who was locally known as "St. Louis Joe," at about one o'clock on the night of the homicide, had visited a house of prostitution kept by one Toll Arnold; that deceased and defendant came to this house about one o'clock on the morning of March 24th, and that they remained therein about an hour, leaving the house together at about two o'clock. While in this house, deceased was entertained on two different occasions by two different inmates of the place. He had bought some beer and spent twenty cents in a music box or piano; spending there altogether some $3.20. During the whole of this time defendant remained in the parlor or reception room; but was not entertained by any of the inmates and spent no money. While in the house deceased made inquiry as to where he could obtain a

bed. He was offered accommodations at this house, but deeming the price quoted exorbitant he asked the keeper of the house where he could find a cheap bed, and was, among other places, directed by her to a certain livery stable where some Italians were rooming. Later, in this house he exhibited a pocket book in which, in addition to the silver money with which he paid his reckoning, there was certain paper money, the amount of which is not disclosed. The evidence does not definitely show that defendant saw this money, though the pocket book which contained it was exhibited and opened in the room in which defendant sat at the time. While in the house deceased made some inquiry as to the whereabouts of one Jack Murphy, against whom he made threats, and who he said, was entertaining illicit relations with the wife of deceased and having her come to Kansas City to visit him, the said Murphy. Deceased was informed that Murphy had been, up to a month before, in the saloon business on Fifth and Grand avenue, but that he had quit this business, and his whereabouts were at the time of the inquiry unknown. So far as the record before us shows, the whereabouts of Murphy continues to rest in darkness.

Upon the information set out above reaching the police they began a search for defendant, whom they had considerable difficulty in locating, for the reason that his real name was not known to them, they being advised only of the name of "St. Louis Joe," by which he was known to the keeper of the bawdy house. Later he was found, and upon being questioned as to his whereabouts on the night of the homicide, told the police that he had gone to bed early on that night; that he slept over on Holmes street at the Northern Hotel. Defendant further denied that he had ever seen the dead man, or any man dressed as the dead man was described to him as being dressed, and further denied that he had ever been with deceased. Later in the

examination by the police of defendant, on being con-
fronted with the statements of the inmates and keeper
he admitted that he had been with deceased at the house
of Toll Arnold, but he stated that upon leaving this
house he had directed the deceased to a hotel and had
left him about the corner of Fifth and Grand avenue,
going himself immediately to the Northern Hotel where
he went to bed.

The testimony which is at no point as clear as it
might be, and as it seems to us as clear as it might have
been made, tends to show that defendant at the time of
the homicide was living with his cousin at 825 Missouri
avenue in one of a row of flats located on this street.
These flats are some eight blocks from the bawdy house
which deceased and defendant admittedly visited.  The
first one of the flats in question, which is No. 815 Mis-
souri avenue, corners on the alley; at this corner and in
the opening of this alley, a large amount of blood was
discovered on the snow, and there was evidence of a
scuffle.   Thence this blood trail led south along the
sidewalks and close to the walls of the row of flats, in
one of which defendant lived; through the hallway be-
tween 827 and 829; out the back way, and down the side-
walk to Campbell street, where deceased was found
murdered.   The trend of the testimony indicates that
deceased was killed about three o'clock on the morning
of March 24th, since a Mrs. Phemister, who was a wit-
ness in the case, says that about the hour mentioned
she heard two muffled pistol shots somewhere out in
front, and that she, a moment afterward, heard some
one running through the passageway between flat 827
and 829.  The runner, from the sound of the foot falls,
seemed to have on rubber overshoes, and was screaming
"Help!" "Murder!" and calling the police.

Upon the trial defendant, who testified for himself,
says that he first saw defendant about one o'clock
Saturday morning; that he met him accidentally on the
street and was asked by deceased to direct him to a

house of prostitution, and thereafter he went with the deceased to the house of Toll Arnold, and for this service the deceased paid him fifty cents. Defendant's statements as to the occurrences in this house differ in no material respect from what has already been set out. Upon leaving the house at about the hour of two o'clock, defendant says that he was asked by the women to show deceased a rooming house; that he started with him for this purpose; that deceased expressed a desire to find one Jack Murphy, whom deceased had accused of running away with his wife. Defendant says that he endeavored to dissuade him from seeking Murphy that night and that he thereupon pointed out to him a rooming house; left him, and went to the DeMoore Hotel and went to bed.

In the signed statement made by defendant he had at first denied any knowledge whatever of deceased, and stated that he had slept on the night of the murder at the Northern Hotel; in his testimony upon the trial he says he slept that night at the DeMoore Hotel. Upon investigation later made, it was found that he had not been at the Northern Hotel, and upon the trial it was not shown that he had been at the DeMoore Hotel. His name was not on the register, though guests were required to register, nor did the keeper of this hotel remember of his having been there. There was no evidence worthy of the name as to his presence at the DeMoore Hotel on the night in question.

Though the prosecution was for murder in the first degree, and the jury were instructed that they might find him guilty of this grade of offense, they did not see fit to do so, but found him guilty of murder in the second degree and fixed his punishment at twenty years' imprisonment in the penitentiary.

I. A number of questions are raised in the motion for a new trial and in the brief filed here, touching all of which we have carefully examined the record.

The chief point of contention and the serious one in the case, is whether there was sufficient testimony to go to the jury. The motion for a new trial, it is true, is in the usual form, and without any basis being furnished therefor by the record, attacks alleged errors of the court in erroneously instructing the jury, and in the failure of the court to instruct the jury upon all the law in the case and in the admission of incompetent, irrelevant testimony on the part of the State.

**Fair Trial.**

We have carefully combed the record to ascertain what, if any, of these objections, are founded in fact upon the record. Much latitude was taken by the prosecuting attorney in eliciting testimony, but these excursions into the realms of inadmissible evidence were all made without objection or exception on defendant's part. When objections were made by defendant they were uniformly sustained by the court, and many times the court himself called defendant's attention to inadmissible testimony and invited objection, and whenever the invitation was accepted, sustained the same.

We have carefully examined the instructions given by the learned trial judge and are convinced that these instructions were well and carefully drawn and safeguarded at every point the rights of defendant. The instructions given by the court on the nature and quantum of circumstantial evidence were full and fair, and are all that the defendant is, under the law, allowed; and if a technical objection can be urged against them it might well be that they go further in cautionary limitations than defendant was entitled to have them go.

II. The chief contention and the serious question is as to the sufficiency of the evidence to sustain the conviction. Upon this contention and question the defendant in his motion for a new trial has rung all of the changes. It is the only point that he urges in his brief. Shall we re-

**Sufficiency of Evidence.**

verse this case for lack of testimony to support the charge?

It is well-settled in all jurisdictions that convictions for crime may be had upon circumstantial evidence. To justify such conviction two things are required: First, the *corpus delicti,* and, second, the defendant's guilty agency in the crime. [State v. Dickson, 78 Mo. l. c. 447; State v. Francis, 199 Mo. 671.] That the unknown man was murdered there is no doubt from the physical facts; there is not even a suggestion of suicide. The direct and positive facts, coupled with the physical facts eked out by the circumstances of the case, show a murder and not a suicide beyond cavil or doubt. But the defendant's guilty agency in the crime is the serious and troublesome question in the case. His own evasions, denials, contradictions and falsities are the most damning indications of his guilt. [Fuller v. State, 109 Ga. 809; People v. Conroy, 97 N. Y. 62; Cathcart v. Commonwealth, 37 Pa. St. 108; Boines v. State, 43 Tex. Crim. 490; People v. Durrant, 116 Cal. 179; State v. Howard, 118 Mo. 127.] Though great hue and cry is raised as to the finding of this murdered man; though the papers seem to have been full of this mystery for many days; though the man was either shot or stabbed at the corner of the flats in one of which defendant lived with his cousin; though after being wounded, inferentially unto death, he ran, as the blood trails show, through the hallway of the flat adjoining that occupied usually by the defendant; though he fell and died within a short distance of defendant's abode, and though defendant had been with him at a house of prostitution until a short time prior to his death, the defendant, throughout all the excitement of the hue and cry, stands silent. When the defendant is arrested he makes many false statements as to his whereabouts on the night of the murder; he denies being with deceased, and he denies ever having seen deceased until confronted by the women of the bawdy house. De-

fendant avers that he was at the Northern Hotel; that he went to bed there at nine o'clock, but later contradicts himself again and admits his presence at the bawdy house with the dead man. Defendant swears at the trial that he left the bawdy house with deceased about two o'clock; that he parted from him after showing him a rooming house; went himself to the DeMoore Hotel and went to bed. Upon the trial no proof in corroboration of his having slept at the DeMoore Hotel is elicited. His signed statement says that he stayed at the Northern Hotel, but an investigation shows this to be false; and his own testimony upon the trial is that he was at the DeMoore Hotel, which latter statement is either shown to be false or not shown to be true, though an effort in that behalf is made.

A survey of the uncontradicted facts and of the chronology of the tragedy brings the presence of defendant dangerously near the scene of the killing at the precise moment the same occurred. Defendant left the bawdy house with deceased at a time indefinitely stated by the witnesses as "about two o'clock." At "about three o'clock" thereafter at a point eight blocks away, the street cars being stopped and the sidewalks being impeded with some two or three feet of snow, two pistol shots are heard, either on Missouri avenue or Campbell street; a person is heard traversing the passageway of 829 Missouri avenue, crying "Murder!" and a trail of blood through the snow from the point of the initial scuffle down the street, through the hall of the flat and out on Campbell street, where the dead man is found, point unmistakably to the identity of the latter with the pistol shots, the scuffle and the blood trail. There was testimony which the jury had the right to believe, that defendant at the time of the homicide was living with his cousin in one of these flats, not many feet from where deceased was shot and stabbed, and almost adjoining the hallway through which deceased ran. The jury may well have found that defendant did room at

this flat. If they did so find, then so far as we are concerned with the law of this appeal, we must also find that defendant did live at this place. Absent the defendant's many contradictory, false and misleading statements which we note above, and present an initial admission when first arrested of his knowledge of deceased, and of his having been with him, we should say without any hesitation that there is no sufficient proof to go to the jury. But that these things constitute elements, or links in the chain of circumstantial evidence, all courts and all of the textwriters agree. If the accused, when search is being made, attempt to direct suspicion from himself (Commonwealth v. Webster, 5 Cush. 295); if he make false statements as to his whereabouts; if he deny at first and afterward admit incriminating facts, elements or circumstances, all these things with many others not here present, and not necessary to set down, have been held to be circumstances from which guilt may be deduced. [State v. Hudson, 110 Iowa, 663; People v. Conroy, supra.]

The courts have said that one of the usual indicia of guilt is the failure of the accused to account for himself at the time of the crime. [State v. Crabtree, 170 Mo. l. c. 656.] Here defendant is shown to have been in the company of the dead man but a few minutes before his death, and though upon the trial he tells his whereabouts fully, he is not corroborated in any wise, but is contradicted by such evidence as is offered and by his own prior statements. Some evidence of motive is apparent from the record. Deceased had money on his person as late as two o'clock; he is found robbed and dead at 5:35 o'clock. Defendant was in the same room with deceased when the latter exhibited his pocket book in which there was paper money. There is no proof directly showing that deceased saw this money, nor is there proof that he did not see it. No fact preventing his seeing the money is shown by the record. He saw deceased spend, as he admits, four or five dol-

lars; deceased had given him fifty cents to show him a bawdy house and made inquiry of him as to a rooming house. In a case like this the matter of motive is necessarily of paramount importance. When a defend-- ant's agency or participation in a crime is otherwise sufficiently established, lack of motive is of no great moment. [State v. David, 131 Mo. l. c. 397; State v. Crabtree, 170 Mo. l. c. 651.] But when the facts exist in a case as they occur here, if there is no motive shown, no guilt can with any sufficient legal certainty, be attributed to defendant. With almost absolute certainty it may be said that the unknown man in the case was killed for the purpose of robbery. The facts also, when fully considered, lead to the legitimate and reasonable inference that defendant was with deceased almost up to the time at which other evidence in the case shows him to have been murdered. From the very nature of things, the quantum of circumstantial evidence which suffices to meet the requirements of the rule that the circumstances proved must be consistent with each other and with the hypothesis that the accused is guilty, and so inconsistent with any reasonable hypothesis of innocence as to exclude every rational hypothesis except that of guilt (State v. Morney, 196 Mo. l. c. 49), differs in different cases, so as to preclude the formulation of any fixed, hard-and-fast rule.

As a court of errors, it is not, as a rule, our duty to pass upon the facts of a case. Where there exists upon the record, what has been rather loosely called any "substantial evidence" of the existence of a state of facts legally required to be shown, it is our duty to relegate the determination of controverted questions to the triers of fact. "The rule is, that before this court will relieve on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is, that the verdict is the result of pas-

sion, prejudice or partiality.'' [State v. Glahn, 97 Mo. 689; State v. Howell, 100 Mo. l. c. 659.]

There is a bare possibility of the defendant's innocence, but upon the whole record a ''moral certainty'' of his guilt. The possibility of his innocence rests upon unreasonable hypotheses. Deceased may, it is true, have foregathered with the nebulous and elusive Jack Murphy, and have been killed by the latter; but, then, why the robbery perpetrated upon him? Hold-up men might have accosted him, robbed him and killed him, but why then the silence of defendant, and his varying, false and contradictory statements? If he did not, as he says, know that the man in whose company he was, had been killed, why deny, as he at first vehemently did, that he knew or had ever seen such a man as deceased, or any man dressed and described as deceased was.

Weighing the facts, as required here, in the most delicate scales of reasonable doubt, which must be a substantial doubt, such as an honest, fair and intelligent juror, dominated by a conscientious desire to see the truth, might with reason entertain from a consideration of all of the evidence, facts and circumstances in the case, we cannot say even upon the cold record, that the triers of fact erred. We are unable to even concede the lack of the requisite quantum of evidence, or to grant that there was a total failure of proof. As to passion, prejudice or partiality, there is no hint or sug· gestion upon the record, or any reason arising from the facts or deducible inferentially from the relations or standing of the persons involved. We rule this point against defendant, and since there is no other point of pith or moment in the case, we affirm the judgment. *Brown, P. J.,* and *Walker, J.,* concur.