### P. J. KLINE v. THE STATE.

No. 3663. Decided October 15, 1915.

Rehearing denied February 2, 1916.

1.—Arson—Bill of Exceptions—Evidence—Letter.

Where, upon appeal from a conviction of arson, defendant's bill of exceptions to a certain letter introduced in evidence by the State was that it was wholly irrelevant and immaterial, did not prove or tend to prove any issue in the case and was highly prejudicial to defendant's rights, without stating any facts to enable this court to understand whether the court's ruling was correct, the same was insufficient to be considered on appeal. Following James v. State, 63 Texas Crim. Rep., 75, and other cases. Davidson, Judge, dissenting.

2.—Same—Bill of Exceptions—Qualification by Judge.

Where defendant accepted the bill of exceptions as qualified by the court that the objections urged to the introduction to defendant's letter were made at the time the district attorney was reading said letter to the defendant on cross-examination, and before said letter had been offered in evidence by the State and that no objection was made thereto at the time the same was introduced in evidence, the same presents no reversible error. Davidson, Judge, dissenting.

3.—Same—Evidence—Letter—Fabricated Defense.

Where, upon trial of arson, the State introduced in evidence a letter written by defendant some time prior thereto, which tended to show an attempt to fabricate a defense and to divert the suspicion from himself, and to induce the agent of an insurance society to pay him the insurance upon said alleged burned house before the truth could be discovered, and also to fabricate an alibi, there was no reversible error. Following Baines v. State, 43 Texas Crim. Rep., 490. Besides, the jury could not in the slightest have been influenced by the language in said letter. Harper, Judge, concurring only on the ground of recent precedent. Davidson, Judge, dissenting.

4.—Same—Argument of Counsel—Charge of Court.

Where, upon trial of arson, certain letters written by defendant were in evidence and the State's attorney, while commenting thereon, expressed his wonder why defendant didn't know it was a violation of the Federal law to send such letters through the mail, to which the court promptly sustained an objection and charged the jury not to consider same, there was no reversible error. Following Miller v. State, 31 Texas Crim. Rep., 609, and other cases.

Vol. 78 Crim.-39

**5.—Same—Charge of Court—Limiting Testimony—Letters in Evidence—Presumption.**

This court must presume that when the court prepared his charge he gave the counsel opportunity to make objections thereto, and where this was not done, and it appeared from the record that counsel only requested the court orally to limit certain letters in evidence for the purpose for which the same were admitted in evidence, and the court informed them that if they would write such charge he would submit it to the jury, which they failed to do, and the bill of exceptions did not indicate what limit should have been placed in the charge on said letters, there was no reversible error. .

**6.—Same—Bill of Exceptions.**

Where the bill of exceptions in no way showed what the answer of a certain, witness for the defense would have been to a certain question, there was nothing to review on appeal.

**7.—Same—Alibi—Railroad Tickets—Sufficiency of the Evidence.**

Where, upon trial of arson, it appeared from the evidence that the defendant was a Catholic priest and possessed a clergyman's certificate from the railroad which authorized him, when purchasing a ticket to fill out certain blanks therein, giving the name of the place to which he wanted the ticket and signing his name to get the ticket at half price, the selling ticket agent stamping on the back of both ticket and stub the place and date of the purchase, etc., and the introduction in evidence of these documents showed that defendant was not at the place where he claimed to be while said alleged house was burned, but was at the place where the same was burned, and the State's testimony showed that when defendant was told that the said tickets were canceled and that he had procured them, defendant denied same, and the testimony was otherwise sufficient to sustain the conviction, there was no reversible error. Davidson, Judge, dissenting.

**8.—Same—Evidence—Bill of Exceptions.**

Where the bill of exceptions showed no reversible error as to the admission of testimony and the record showed besides that the matter was proved by other witnesses and defendant himself to which there was no objection, there was no reversible error.

**9.—Same—Bill of Exceptions—Harmless Error—Letters—Rehearing.**

Where, upon trial of arson, defendant objected to the introduction of certain letters he had written, and this court held on appeal that his bill of exceptions was insufficient to be considered by this court in its original opinion, and the appellant on motion for rehearing again contended that his bill of exceptions was sufficient, and this court passed upon the question therein attempted to be raised and decided same adversely to appellant, it becomes wholly immaterial whether said bill of exceptions was sufficient or insufficient; besides, even if said letter was inadmissible the same would be harmless error as the evidence was sufficient otherwise to support the conviction and the letter could not have prejudiced his rights, as the jury assessed the lowest punishment. Following Alexander v. State, 63 Texas Crim. Rep., 102, and other cases. Harper, Judge, concurring on the ground of recent precedent only. Davidson, Judge, dissenting.

**10.—Same—Rule Stated—Harmless Error.**

If the illegal testimony was immaterial and irrelevant as contended by appellant, and there was sufficient other evidence to support the conviction, the same would not be disturbed because of the error in admitting the illegal evidence. Following Hester v. State, 15 Texas Crim. App., 567, and other cases. Davidson, Judge, dissenting.

**11.—Same—Rule Stated—Harmless Error.**

The erroneous admission of evidence is no ground for reversal when the

appellant could not have been prejudiced by the evidence admitted. Following Bond v. State, 20 Texas Crim. App., 421, and other cases.

### 12.—Same—Alibi—Charge of Court—Sufficiency of the Evidence.

Where appellant in his motion for rehearing contended that the record showed that he established his alibi in the court below, but the record also shows that while he so testified that the testimony of his witnesses was quite weak in sustaining him therein, and that it further appeared that he had made many false statements as to his whereabouts and various other material matters connected with the insurance of the said burned building, and the testimony of the State was sufficient to sustain the conviction under a proper charge of the court on alibi and the law applicable to the facts, there was no reversible error. Davidson, Judge, dissenting.

### 13.—Same—Inferences—Facts Stated—Motion for Rehearing.

Where the appellant in his motion for rehearing contended that this court had not properly stated the facts and the inferences to be drawn therefrom in its original opinion, but the reverse is true, and it appeared that no statement of any of the testimony or the inferences to be drawn therefrom in the original opinion was placed therein because of an inadvertence, but were based on the facts in evidence, there was no reversible error.

Appeal from the District Court of Clay. Tried below before the Hon. J. W. Akin.

Appeal from a conviction of arson; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*G. H. Culp, Arnold & Taylor*, and *Lightfoot, Brady & Robertson*, for appellant.—On question of bill of exceptions: Turner v. State, 61 Texas Crim. Rep., 97, 136 S. W. Rep., 486; Herrin v. Daly, 31 So. Rep., 790; Ridge v. State, 61 Texas Crim. Rep., 214, 134 S. W. Rep., 732; Ellington v. State, 87 S. W. Rep., 153; Gardner v. State, 11 Texas Crim. App., 265; Tijerina v. State, 74 S. W. Rep., 913; Faulkner v. State, 65 S. W. Rep., 1093; Irvine v. State, 9 S. W. Rep., 55; Mask v. State, 31 S. W. Rep., 408; Baker v. State, 11 S. W. Rep., 676; Ortiz v. State, 68 Texas Crim. Rep., 524, 151 S. W. Rep., 1056; Best v. State, 72 Texas Crim. Rep., 201, 164 S. W. Rep., 996; Arnold v. State, 74 Texas Crim. Rep., 269, 168 S. W. Rep., 122; Burke v. State, 25 Texas Crim. App., 172.

*C. C. McDonald*, Assistant Attorney General, and *Leslie Humphrey*, District Attorney, for the State.—On question of bill of exceptions and admission of letter in evidence: Farris v. State, 56 S. W. Rep., 336; Welch v. State, 66 Texas Crim. Rep., 525, 147 S. W. Rep., 572; Irvin v. State, 67 Texas Crim. Rep., 108, 148 S. W. Rep., 589, and cases cited in opinion.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of arson, and his punishment assessed at the lowest prescribed by law.

He has several bills of exceptions. The State objects to these, claiming they are wholly insufficient to authorize or require this court to

consider them. As a sample of them, we will state the substance in full of his first bill, quoting part:

It gives the style and number of the cause, the court and term, and states that upon the trial the State offered in evidence this letter:

"Henrietta, Texas, August 17th, 1914. Mr. C. W. Martin, Omaha, Neb. Dear Sir: Enclosed you will find a check, $25.00, the balance due on the Insurance Policy of our school. I have had great difficulty with our school in order to get it on a running basis, and hope by the first of November to be able to have a good little school for our children. *I have a great obstacle to contend with, or we few Catholics have here, as we are surrounded by Protestant bigots and they seem to hate a Catholic school and have done all in their power to check us.* However, I hope with God's grace and help we will be able to overcome this prejudice. Thanking you for the favors you have extended us, and with best wishes, I am

(Ex. No. 45.)                    Yours in X D,
    Henrietta, Texas, Box 273.                    Rev. Philip J. Kline."

That he objected to it being introduced in evidence, and especially to that part which we have italicized above, on these grounds: (1) It was wholly irrelevant and immaterial; (2) it did not prove or tend to prove any issue in the case; (3) it was highly prejudicial to his rights. That the court overruled his objections and permitted the letter to be read in evidence to which he excepted.

The court approved it with these "qualifications and conditions: The objections urged in this bill were made at the time the district attorney was reading said letter to the defendant on cross-examination, while said defendant was testifying in his own behalf, and before said letter had been offered in evidence by the State; before said letters, including this one, was offered in evidence the following proceedings were had, while the defendant was still testifying in his own behalf on redirect examination by Hon. R. E. Taylor, attorney for defendant: Mr. Taylor, after interrogating the defendant about the amount of improvements he had placed on the burned building, asked the following questions: Q. State whether or not you now say, since you have gone over and read these letters, about what you would say was the amount of money in the aggregate that you spent on this building. A. I would figure between $2500 and $3000. Mr. Taylor: I want to offer in evidence the letters you read here. (It is claimed by counsel for defendant that this offer was made for the purpose of showing his expenditures on the building only; and I accept his version of his offer.) Said letters, including the one here in question, was thereupon offered in evidence, and read to the jury by district attorney. This qualification applies also to all the other letters introduced."

The rules prescribing the requisites of bills of exceptions have been so long and clearly established and reiterated again and again in the books and decisions that we will not again state or quote them here. We merely will again cite some of the cases and the authorities on

the subject. Sec. 857, p. 557, White's Ann. C. C. P., and Sec. 1123, p. 732; James v. State, 63 Texas Crim. Rep., 75; Conger v. State, 63 Texas Crim. Rep., 312; Ortiz v. State, 68 Texas Crim. Rep., 524, 151 S. W. Rep., 1058; Best v. State, 72 Texas Crim. Rep., 201, 164 S. W. Rep., 996; Arnold v. State, 74 Texas Crim. Rep., 269, 168 S. W. Rep., 122. Measured by these rules there can be no question but that this bill is so wholly deficient as not to authorize or require this court to consider the point attempted to be raised by it.

No facts are given to enable us to understand whether the ruling is correct or not. It sets out none of the proceedings so that we can tell anything about it. All it tells is the State introduced said letter in evidence over his said objections. (1) How or why it was irrelevant or immaterial is in no way shown or intimated by the bill. (2) It in no way shows what "any issue in the case" was, so we can possibly tell whether or not it tended to prove them or any of them. (3) It in no way shows how or why it wrongly prejudiced his rights. A mere assertion by him of said several objections in no way shows or tends to show they or any of them are true or good. We are forbidden by the rules to go to the record or statement of facts to aid or defeat his bill. It, of and within itself, must give us all necessary information. The qualification of the judge controls the bill, and it in no way aids, but is against his bill. It shows appellant himself regarded the letter as material and relevant, and as tending to prove some issue in the case, because he introduced it in evidence before the State did, and before he objected to the State doing so. All pertinent and relevant evidence, if incriminating, necessarily injures an accused's rights as tending to show him guilty, or rebut some claimed defense he may assert. That is the very reason it is admissible, and should be introduced. If we could resort to inferences, which the rules forbid, and judging by appellant's brief we might infer, appellant thought the jurors might not be Catholics but "Protestant bigots" and influenced against him by his particular language in his letter specially objected to. But if so, the bill in no way shows it, nor that the jurors are not Catholics. It shows nothing on the subject. Nor does the record otherwise show that any or all the jurors were Protestants, whether bigots or not, or that they were not Catholics.

But suppose we should consider the bill. Then it must be considered in the light of the whole record. It would be but fair to both sides to do this if it is to be considered at all. Then what do we find the record to show in connection with this bill? We will state some of the salient features which are in no way stated by the bill.

The indictment charged that appellant burned his own house, *it being insured at the time.* The testimony showed it had been an old school building of the City of Henrietta long since abandoned, and unoccupied for any purpose, years before, and all the time it was owned by appellant, and at the time it was burned. That he bought it and the more than two blocks of ground on which it was situated from said city about two years before it was burned, for $2200, paying only $200

cash, and giving his three notes in about equal amounts for the balance due in six, twelve, and eighteen months thereafter. That during the time he owned it he made certain alterations in the internal arrangement of the building at a cost claimed by him to be about $2500 to $3000. These alterations by no means added the costs thereof to the value of the building, for one of the doctors to whom appellant offered to sell it for a hospital, very shortly before it was burned, testified said alterations injured the building for hospital purposes. It was shown appellant offered to sell it to some doctors, at first pricing it to them at about $6000. They declined to buy at that price. One real estate agent testified that $2500 was a fair market value for the building and ground at the time the building was burned. Mr. Peninger, Assistant State Fire Marshal, who talked to appellant very soon after the fire, testified appellant then told him he had offered to take $3500 from the doctors for the building and ground for a hospital, and his faint recollection was, appellant also at that time said the ground alone, without the building, was worth $2000 to $2500. Appellant did not deny any of this. That in order to get a loan on said building and ground from the Marquette Life Insurance Company for about $1800, which he did, on March 1, 1913, he took out a fire insurance policy in his favor on said building from a local agent at Henrietta in the Commercial Insurance Company for $2500 with loss payable to said life insurance company to also secure it in said loan, and that one year later, March 1, 1914, he had that policy renewed for another year. That on March 19, 1913, he also for himself insured said building for three years in the Catholic Mutual Relief Society of Omaha, Nebraska, through its secretary, Mr. Martin, at Omaha, for $8000 additional. Said relief society was exclusively owned and controlled by bishops of the Catholic church, and Mr. Martin was a Catholic. Appellant was a Catholic priest, and had resided at Henrietta and had his home and church building and organization, and ministered there for about five years before and at the time of said fire. The evidence tends strongly to show, if it does not clearly do so, that appellant did not tell either of said insurance companies at the time he took out said insurance policies, and renewed said $2500 one, of the insurance he was taking out from the other company, and that neither company, nor any agent of either, had any notice or knowledge thereof until long after said fire. That when appellant was first interviewed by Mr. Peninger and others soon after said fire he repeatedly and specially and positively stated to them that he had no insurance whatever on said building except said $2500 policy, and that when said house was burned he was in Ohio, telling particularly the route and railroad he went and the cities he passed through and a certain priest he had seen in Ohio on the trip. All his said statements were conclusively shown to have been false. Mr. Easley, the adjuster for said Catholic Relief Society, swore that when he first saw appellant after the fire appellant told him he had no insurance whatever except in said Catholic Relief Society, and he found out about said $2500

policy later. Said building was shown to have been burned—entirely consumed by fire—just after nightfall on Friday, October 9, 1914. The evidence was wholly circumstantial, but tended very strongly, if it did not conclusively, show that appellant himself burned his building, at least it was amply sufficient for the jury to so believe and find. His defense was alibi.

Evidently the State's theory and contention was, that appellant burned his own building to get said very large and excessive amount of insurance, and that his scheme was, even before the fire, to represent to Mr. Martin, the secretary of said relief company, a Catholic, and prepare and induce him to believe, that when he himself should burn it, it was not he, but some "Protestant bigot"—his or his church's enemy; and the State's further theory and contention was, that also after the fire he continued such representations to thereby induce said Martin, and relief association, to pay him said $8000 insurance before said Martin or said relief society knew of said other $2500 policy, or suspected him of burning his house to get the insurance. In other words, the State's theory and contention evidently was, that appellant was attempting to divert suspicion from himself by false representations both before and after the fire—clearly fabricating his defense, or attempting to do so.

Under these issues, if we could consider his bill, clearly said letter was admissible as tending to show his attempted fabricated defense, and his attempt to divert suspicion from himself, and also induce said Martin and relief society to pay him said $8000 before they could learn the full truth. This evidence was just as admissible as was his false statements that he was in Ohio when his house burned, thereby attempting to falsely fabricate an alibi. Barnes v. State, 43 Texas Crim. Rep., 497; sec. 1052, subdiv. 6, Wh. Ann. C. C. P., and authorities there cited; 2 Wh. on Crim. Ev., pp. 1752-1753 and p. 1485; secs. 1070 and 1072, Wh. Ann. C. C. P., and authorities cited. All the authorities are to the same effect. The statement of facts shows appellant himself testified, "personally I do not think there was any prejudice or ill-feeling towards me as a Catholic priest before this fire. I do not think there was any prejudice or ill-feeling here towards the Catholic church; I should not think there would be." The jury certainly were not in the slightest influenced by his said language in said letter, even if it should be held inadmissible, for they assessed the lowest penalty authorized by law.

What we have said and held as to appellant's first bill equally applies to his second, and others objecting to letters.

Appellant's third bill shows that while the district attorney was commenting on one of his letters in evidence he said he wondered if appellant did not know it was a violation of the Federal law to send it through the mail. Appellant objected to this. The court promptly sustained his objection, and instructed the jury not to consider said argument. This presents no error. Miller v. State, 31 Texas Crim. Rep., 636; Hatcher v. State, 43 Texas Crim. Rep., 239; Martoni v.

State, 74 Texas Crim. Rep., 90, 167 S. W. Rep., 349, and other cases there cited.

The district attorney had the right to comment as he did on appellant's letter and his testimony as complained in appellant's fourth bill.

We must assume, and it is no doubt a fact, that the court prepared his charge, and furnished it to appellant's attorneys before the argument and before he read it to the jury, as the law requires. They had ample opportunity to make objections thereto in writing as the law also requires. They made none. However, while said letters were being introduced in evidence they "verbally requested the court to limit said letters and the matters contained therein for the purpose for which the same were admitted." The court then informed them, if they would write such charge he would give it to the jury. They did not write, nor request such charge in writing. Appellant's bill on this subject does not indicate what limit should have been placed on the letters, etc. Clearly under the law as it now is—not as it formerly was—the burden is not wholly on the judge, but is also on the appellant and his attorneys to see that a correct charge is prepared and given. It appears to us, that even if any charge on the subject should have been given at all, then it was appellant's fault and not the court's that it was not given, and as the matter is presented no error was committed.

Appellant complains of the court's refusal to let Mr. Coughanour answer a certain question. The bill in no way shows what his answer would have been, and hence presents no error even if the question had been such as was proper for him to have answered.

It was shown that appellant had a clergyman's certificate from the railroads. This authorized him, when purchasing a ticket, by filling out a blank, giving the name of the place to which he wanted the ticket and signing his name, to get the ticket at half price, the selling ticket-agent stamping on the back of both ticket and stub the place and date of the purchase. He would keep the stub or application and present that and his ticket when the conductor or train auditor would collect tickets or fares. The conductor and auditor had to and did, at the end of their runs, send to the proper railroad officials reports of these stubs and tickets, and all other tickets, and the tickets and stubs with them, indicating the train and time such were used on their trains. The State procured, produced, identified and introduced in evidence, among others, appellant's stubs showing that he purchased at Dallas a ticket from Dallas to Bridgeport October 8, 1914, on the Rock Island Railroad. That on the same day at Bridgeport in his stub 41, he bought another ticket from Bridgeport to Bowie from the same railroad. Bowie is where said railroad and the Fort Worth & Denver cross. The Rock Island does not run from Bowie to Henrietta; the Fort Worth & Denver does. That on the night of October 8th, after midnight, which would make it in the early morning of October 9th,—on his stub 42 he bought at Bowie from the Fort Worth & Denver, a ticket from Bowie to Henrietta. The Rock Island night train from Dallas through Fort Worth

to Bridgeport arrived at Bridgeport, schedule time, 11:45 p. m. and remained there five minutes, and reached Bowie after midnight—more than an hour after leaving Bridgeport. The ticket sold to appellant on stub 42 was sold in the early morning of October 9th for train No. 7, north or west bound, which was due to leave Bowie at 1:55 a. m. on the morning of October 9th and would arrive at Henrietta about an hour later, and was used on that train as the evidence clearly shows. Night trains passing through Henrietta and Bowie south or east are shown to do so in the early morning after midnight. The M., K. & T.—Katy—Railroad is shown to run from Wichita Falls through Henrietta, and to and through Ringgold on to Fort Worth. Ringgold is where the Katy and Rock Island cross. The exact distance between Bridgeport and Bowie, and Bridgeport and Ringgold, and Bowie and Henrietta, and Henrietta and Ringgold, are not given, but clearly such data is given, which shows these distances are short—taking from a short time over to under an hour for trains to run. Neither is schedule time for trains passing through Henrietta south or east on the Katy at night given, but such data is given as satisfies us they, like trains on said other railroads pass through in the early mornings—after midnight. Appellant's stub 44 and ticket show he bought and used, on October 10th, a ticket from Ringgold to Bridgeport, and stub 43, a ticket on October 11 from Bridgeport to Fort Worth. All these canceled stubs, 40, 41, 43 and 44, the canceled tickets accompanying them, respectively, were procured from the Rock Island Railroad and stub 42 from the Fort Worth & Denver, by said State's witness Peninger, who swore that when he told appellant he would or had procured them, that appellant said "they did not exist" that "there were no such tickets."

There is no merit in appellant's last two bills to Mr. Lingenfelder's testimony which shows any reversible error. Besides what he testified to is abundantly proven by other trainmen and appellant himself, to which there was no objection.

As stated, appellant's defense was alibi. When he first talked about the burning of his house after the fire he told several parties positively he was in Ohio at the time of the fire. Later that he was in Fort Worth at the time. His attorneys now claim that he was in Bridgeport. At first after the fire he likewise positively told those inquiring about said $2500 policy that that was the only insurance he had, and to those inquiring about the $8000 insurance in the Catholic Relief Society, that that was the only insurance he had. Both his statements that he was in Ohio and about his insurance, were conclusively shown to have been false. If the jury had believed his testimony on the trial, that he was in Fort Worth when the fire occurred they would have acquitted him. They were clearly justified, from all the evidence, in not believing him, but to believe, as was in effect demonstrated by the evidence, that he was in Henrietta and himself set fire to and burned his house to get said insurance. We deem it unnecessary to further state the testimony. We have carefully read and studied the record

and statement of facts more than once, and are thoroughly convinced that the evidence is clearly sufficient to sustain the verdict.

The judgment will be affirmed.

*Affirmed.*

### ON REHEARING.

February 2, 1916.

PRENDERGAST, PRESIDING JUDGE.—The original opinion was prepared and on full consultation with every member of the court was assented to at the time and before it was handed down. It was prepared after a most careful and thorough study of the whole record, the questions raised and the authorities applicable thereto.

There are but few things further to be said at this time. An extensive argument is made wherein it is contended that appellant's first bill of exceptions was sufficient under the rules not only to authorize, but to require, this court to consider the question therein attempted to be raised. Under the authorities there can be no shadow of doubt but that said bill of exceptions was wholly insufficient under all the rules to require consideration by this court. There is not a case in all the books but that hold it insufficient, and not one that would hold it sufficient.

But it is wholly unnecessary to discuss that question because, as the original opinion clearly shows, we did consider said bill fully and completely and passed upon the question therein attempted to be raised. So that whether the bill was sufficient to require a consideration or not, is wholly immaterial. It was considered. In the consideration of it, however, we did so in connection with the whole record, and stated all the material matters which the record showed, so as to pass upon the question raised with reference thereto, and we held that the letter was admissible.

We also specifically held therein as follows: "The jury certainly were not in the slightest influenced by his said language in said letter even if it should be held inadmissible, for they assessed the lowest penalty authorized by law." This feature only of the matter will now be further treated.

It may be conceded for the sake of argument that the letter was inadmissible and the court erred in admitting it, but, if so, under the authorities, it would not require or authorize a reversal, for it was harmless error.

The rule on this subject is specifically stated by this court in Hester v. State, 15 Texas Crim. App., 567, as follows: "If the illegal testimony was immaterial and irrelevant, and there was sufficient other evidence to support the conviction, such conviction would not be disturbed because of the error in admitting the illegal evidence. We believe such to be the correct rule of practice for this court in all cases except capital ones."

As stated by this court in Haynie v. State, 2 Texas Crim. App., 168, which is quoted in the Hester case, supra, that it is when "illegal evi-

dence or an *important* fact, *material* and *pertinent* to the issue," is admitted over objections, which will require a reversal. The court in the Hester case further says that, if the evidence admitted over objections was immaterial and irrelevant to the issue, this court should not reverse, stating this position is "correct in all cases except capital ones." To the same effect is Post v. State, 10 Texas Crim. App., 579, in an opinion by Judge Hurt, wherein he quotes McWilliams v. State, 44 Texas, 116, for the rule that it is only where illegal and erroneous evidence is admitted over objections which goes to establish a material and pertinent issue in the case that it requires reversal, and in that case held that certain testimony admitted over the objections of the defendant did not authorize a reversal, because no injury therefrom occurred to the accused. He further holds: "If this court must reverse for every irregularity, though objected to, whether it tended to injure defendant or not, it would be almost impossible in a great many cases to legally convict. The action of the court in this matter was wrong, but, no injury appearing therefrom, we can not make it a ground for reversal"

Again, this court, through Presiding Judge White, in Bond v. State, 20 Texas Crim. App., 421, said: "The erroneous admission of evidence is no ground for reversal when the appellant could not have been prejudiced by the evidence admitted. (State v. Hallett, 63 Iowa, 259; Evans v. State, 13 Texas Crim. App., 225; Cose v. State, 6 Texas Crim. App., 121.)" To the same effect is Sadler v. State, 20 Texas Crim. App., 196.

In King v. State, 42 Texas Crim. Rep., 108, Judge Davidson said: "The admission of irrelevant or inadmissible testimony will not require a reversal unless its effect upon the defendant's case was probably injurious. . . . If the punishment allotted had been above the minimum, this error would have required a reversal, for in that event its operation might have been prejudicial."

Presiding Judge Hurt and Chief Justice Roberts said: "To reverse in the absence of probable injury would be contrary to principle." Davis v. State, 28 Texas Crim. App., 542; Bishop v. State, 43 Texas, 390; Alexander v. State, 63 Texas Crim. Rep., 102.

This rule that immaterial evidence erroneously admitted over objections is not ground for reversal and is harmless error is fully discussed in Tinsley v. State, 52 Texas Crim. Rep., 91, wherein Judge Davidson, in substance, said: "One of the safe rules in ascertaining whether the evidence prejudiced appellant, is the question, did the evidence in any sense strengthen the State's case? If it did not, it would not present reversible error." Knight v. State, 64 Texas Crim. Rep., 541. This has so many times been held, and in such a variety of cases, that it would practically be impossible to cite all of the cases so holding and wherein this court has refused to reverse, and a waste of time. However, we will cite some of the other cases so holding. Coleman v. State, 53 Texas Crim. Rep., 578; Arnwine v. State, 54 Texas Crim. Rep., 213; Underwood v. State, 55 Texas Crim. Rep., 601; Boyd v. State, 57

Texas Crim. Rep., 250; Ray v. State, 60 Texas Crim. Rep., 138; Leggett v. State, 62 Texas Crim. Rep., 99; Sparks v. State, 64 Texas Crim. Rep., 610; Davis v. State, 68 Texas Crim. Rep., 259; Moore v. State, 65 Texas Crim. Rep., 453; Thompson v. State, 70 Texas Crim. Rep., 610; Bailey v. State, 65 Texas Crim. Rep., 1; Cameron v. State, 69 Texas Crim. Rep., 439; Douglass v. State, 73 Texas Crim. Rep., 385.

Appellant's objection to said letter being introduced in evidence is specifically stated as: (1) That it was wholly "irrelevant and immaterial." (2) It did "not prove, or tend to prove, any issue in this case." Surely, if these objections are true, then the admission of said letter, under the authorities, should in no event result in reversal. (3) His third and only other objection is that "it was highly prejudicial to his rights." How it was prejudicial is in no way intimated by the bill. It did not tend in the slightest under his theory to prove him guilty of the offense. And the only effect it could possibly have had would have been to have caused the jury to fix his punishment at greater than the least, but, as shown, the jury fixed his punishment at the lowest prescribed by law. Hence, the conclusion is certain and inevitable that he was not prejudiced thereby, and no injury resulted to him.

Appellant still contends that he established an alibi; that he was in Fort Worth on the Friday night when his insured building was burned. It is true he so testified, and he further testified that he did not burn his building, and that he was not in Henrietta when it was burned. Even if he did so testify, the jury did not have to believe him, and unquestionably did not believe him. He had told so many falsehoods as to his whereabouts and various other material matters connected with the insurance of his said burned building, which were unquestionably shown to have been false and some so admitted by him on the stand, that it is no wonder that a jury would not believe him. Under the facts, they should not have believed him. The court gave a correct charge on alibi in his favor. There is no complaint whatever to this charge.

As to his claim that he was in Fort Worth when his building was burned, he attempted to prove by only two witnesses that he was there at the time. These two witnesses were Sister St. Dennis and the priest, Rev. E. J. Cussen. Of course, we can not copy the whole of the testimony of either of these witnesses, but we think no one can read their testimony and for a moment doubt that, upon the whole, neither testified that he was at Fort Worth when his building was burned, when their whole testimony is considered.

Sister St. Dennis swore that appellant was at the St. Joseph's Infirmary at Fort Worth on the 7th of October, and that he was there also on the 11th of October. She swore: "He was there some time during the week; *I could not tell you the date.*" "I can not tell this jury the date on which he was there." On cross-examination she swore that he was there on October 11. "I don't remember the date he was there before that." (Statement of Facts, p. 166.)

Rev. Mr. Cussen was examined with reference to trying to fix the time that appellant was at said infirmary and tried to show that he was there on the evening and early part of the night of October 9th, the night the house was burned, but nowhere in his direct testimony does he specifically state that he was there at that time. On cross-examination (p. 168, Statement of Facts) he swore: "I have not got an idea where Father Kline was on the night of October the 8th. I don't know whether he was in Fort Worth or Bowie on the night of October 8th. . . . ." It is true that, in his further cross-examination, he stated in substance that he believed he was there on the evening and. early night of October 9th, but at the wind-up and conclusion of his whole testimony on cross-examination, he swore: "He (appellant) was there Wednesday night, and he went to Dallas Thursday morning; at least he told me he went to Dallas. He came back, but I can not say where he came from. He told me he was going to Dallas Thursday morning. I have said that time and again. He did not come back from Dallas or the place where he went on that same day, October 8th. He didn't stop at. the St. Joseph's Infirmary on the night of October 8th, to the best of my belief, but he did stay the night of the 7th, or Wednesday night, and ·the next time he stayed there was on the night of the 11th." (Statement of Facts, p. 170.) Appellant swore he went to Dallas late in the evening of October 8th, and not in the morning, and returned to Fort Worth from Dallas, and stayed at St. Joseph's Infirmary in Fort Worth that night—the night of the 8th, and all the next day and until after supper, and left on the 9:30 train.

No other witness was offered or testified that he was at Fort Worth on October 9th at any time, day or night.

Now let us see what the State proved as to his whereabouts on the night of October 8th, the early morning of October 9th, about the middle of the evening on October 9th and at night,. October 9th.

Mr. Devoss, the ticket agent of the Rock Island Railroad at Dallas, swore that on October 8th, as such agent, he sold to appellant a railroad ticket over the Rock Island from Dallas to Bridgeport, on his stub, No. 40, which appellant swore he signed for that ticket. They were produced, and the stub and the ticket both identified and introduced in evidence. Appellant swore that he bought that ticket late in the evening of October 8th. The train left Dallas for Bridgeport at 7:50 that evening or night. Mr. Black, the ticket agent at Bridgeport for the Rock Island, swore that that Dallas 7:50 train arrived at Bridgeport at 10:45 at night. The State produced, and Mr. Black identified, appellant's stub. No. 41 and a ticket from Bridgeport to Bowie, which unmistakably shows was purchased at Bridgeport by appellant that night. He swore that he signed the said stub applying for the ticket. The Rock Island Railroad crossed the Fort Worth & Denver Railroad at Bowie. It did not run to Henrietta from Bowie, but the Fort Worth & Denver did. Mr. Stephenson, the ticket agent of the Fort Worth & Denver at Bowie, swore that, on the night of October 8th, after

midnight, which would be on the morning of October 9th, he sold to appellant a ticket from Bowie to Henrietta; that the train from Bowie to Henrietta left Bowie at 1:55 in the morning, after midnight, and that it would reach Henrietta about one hour later. The State produced, and the witness identified, appellant's stub No. 42 for said ticket from Bowie to Henrietta, and appellant swore that he signed that stub for that ticket. The State introduced the train conductors, or ticket auditors, who took up tickets from passengers on the train, and other trainmen, and, without reciting the testimony of these respective witnesses, it shows with all reasonable certainty that appellant traveled on said tickets procured by his clergy certificates Nos. 40, 41 and 42 from Dallas to Henrietta on the night of October 8th, reaching Henrietta about 3 o'clock on the morning of October 9th.

This evidence links up and with certainty shows that appellant left Dallas for Henrietta at 7:50 on the night of October 8th; that he reached Bridgeport at 10:45 that night; and that, upon his arrival there, he bought a ticket from Bridgeport to Bowie and continued on that train from Bridgeport to Bowie, arriving at Bowie about an hour later; that he then and there bought a ticket at Bowie for Henrietta, took the train leaving Bowie at 1:55 a. m. and arrived at Henrietta the next morning, the morning of October 9th, at about 3 a. m., some hours before daylight. There can be no question that he then slipped to his home in Henrietta in the dead hours of the night.

Mrs. Flannigan, a resident of Henrietta, and who lived between appellant's residence and said schoolhouse which was burned that night, swore that she had known appellant for some time. That she saw him pass her house going towards said schoolhouse about 2:30 or 3 o'clock the evening the house was burned that night. She swore: "I am familiar with his figure and personal appearance. I was very sure that I saw Father Kline in Henrietta on the day that the schoolhouse was burned. I saw him go by the house (her house) and then in the evening about supper time, I went to close the door (the door of her house). I won't say—I don't think it was an hour or more than an hour, perhaps in half an hour, before the fire, that I taken it to be him that passed our door on the sidewalk. He was going towards the building, the schoolhouse building." She then shows that her front door was only twenty-five or thirty feet from the sidewalk where she saw appellant passing. She swore: "I just watched him until he got up to the next street. I could not say how far that was; and I went back in the house." On cross-examination her testimony may have been somewhat weakened by the appellant's skillful attorneys having her testify that she *might* be mistaken in swearing that it was appellant that she saw on these two occasions. On redirect examination she swore: "I recognized the party that I saw about 2:30 or 3 o'clock on the day the house was burned to be Father Kline—also that night; though, as I said before, anyone might be mistaken after night, seeing him, but I was so sure it was Father Kline, because he had passed our house so many times and because I had saw him so many times. I

think I could not be mistaken, and for that reason I said it was Father Kline." On recross-examination she said: "I say that anyone could be mistaken, but I was so sure I recognized him was the reason I had spoke about it. . . . I saw the side of his face on these occasions."

The testimony unquestionably shows that there was a night train on the Missouri, Kansas & Texas Railroad from Henrietta to Ringgold, a distance of about sixteen miles. Ringgold is where the Rock Island and Missouri, Kansas & Texas cross. Appellant turned up at Ringgold on the morning of October 10th. There can be no question but that the jury were clearly authorized to believe from all the facts that, after appellant burned his house at Henrietta on the early part of the night of October 9th, if he did, he that night took the night train on the Katy, or some other method of transportation, and went from Henrietta to Ringgold, where he turned up the next morning.

Appellant attempted to prove that he arrived at Bridgeport from Dallas or Fort Worth on the night of October the 9th on said train, which reached there at 10:45 at night, and that he remained there at Mr. Cage's hotel that night and went to Ringgold, on the Rock Island, the next morning, whereby he attempted to account for his being at Ringgold on the morning of October 10th. He testified that in effect. He attempted to establish that he arrived at Bridgeport at 10:45 on the night of October 9th, and remained there that night by Mr. Cage, the hotel man, and his wife, and Mr. McDaniel, who ran a restaurant and coffee stand. He attempted to show by Mr. Cage that it was on the night of October 9th, by showing that the Sunday following he, appellant, attended the funeral ceremony of a child who had died there, and superficially Mr. Cage's testimony on direct examination might apparently have that tendency, but on cross-examination he swore that appellant did stay all night with him *some* Friday night and was there the next day and stayed also the following Saturday night and that on Sunday following he attended the funeral of a child, but he could not be certain as to the time. He swore: "I can not tell this jury the date upon which that child's funeral was held. I don't tell this jury whether it was Sunday, October 11th, or Sunday a week later, or a week earlier. I don't know anything about that, only I heard the child was buried. I don't know the date. I don't know what day the child was buried, and, consequently, I don't know what date Father Kline was at my place at that time." Mrs. Cage's testimony was more uncertain than that of Mr. Cage as to the particular time when appellant was there. Mr. McDaniel, the restaurant man, from whom appellant claimed to have bought a cup of coffee after his arrival at Bridgeport at 10:45 at night on October 9th, swore that he could not tell the date on which Father Kline got a cup of coffee at his restaurant. He swore: "I do not know the night of the week or the night of the month. . . . I could not tell you how long it was before the funeral that Father Kline was in my restaurant drinking that coffee." Taking the testimony of these witnesses, separately or together, it utterly fails to fix the time that appellant was at Bridge-

port drinking the coffee and stayed all night at the hotel as the night of October 9th. Anyone reading and studying the testimony would come to the conclusion that it was not on that night, but that it was either the week before or the week after; and, especially, when taken in connection with the tickets and stubs, which do not lie, but speak the truth, there can be no question but that he did not stop off at Bridgeport on the night of October 9th and remain there that night, but that it was some other night when he did this. It is also a very significant fact that he bought no ticket from Bridgeport to Ringgold on the morning of October 10, but did buy and use one from Ringgold to Bridgeport on said morning. The stubs and tickets clearly show this.

It is wholly unnecessary to discuss the testimony of the whereabouts of the appellant on Tuesday night, October 6th, when the first attempt was made to burn his building. Probably he is then shown to have been at Wichita Falls. It is a significant fact, however, that, while he testified that at the instance of one of the insurance companies he had agreed and in fact did have a watchman, who was his cousin, for his said school building, he was not accounted for and was not produced and his evidence introduced by appellant on this trial. The jury could well conclude from all the facts that he was instrumental in having someone else to attempt to burn the house on Tuesday night, when he could establish an alibi, but, as that effort failed, that he himself, afterwards, on the Friday night following, undertook the job himself and succeeded in burning it in order to get $10,500 insurance on an old schoolhouse that was worth not exceeding $2500 or $3500 at the very outside, including the more than two blocks of ground on which it was situated. But whether he had anything to do with the attempt to burn his house on the night of the 6th of October has nothing to do with the facts which show the burning on the night of October 9th, and he may have been entirely innocent of any connection with said previous attempt.

There are many inconsistencies and contradictions in his own testimony on cross-examination. Thus, at one place he testified: "I might have bought a ticket from Bridgeport to Bowie on October 8th, I might have done that. I might have run up. I tell this jury that I might have run up to Bowie on October 8th from Bridgeport." In another place, in testifying about the signed stub by him, No. 41, and the ticket from Bridgeport to Bowie procured thereby, he said: "I might have taken the evening (train) if the ticket is there. Yes, sir; I think I have gone up to Bridgeport. I have a definite recollection of going from Bridgeport to Bowie on October 8th and purchasing a ticket from Bridgeport to Bowie on October 8th. I might have taken that 10:45 train from Bridgeport to Bowie on October 8th in the evening. That would bring me into Bowie about 11:30 or 11:40 that night." (Statement of Facts, p. 137.) It is true that he claimed that, if he did that, that he went back to Fort Worth that night and reached there early the next morning before day, all of which from his own statement is wholly unreasonable, and expressly disputed by his stubs and tickets.

Again, he said: "Here is a ticket here and a credential ticket from Bowie to Henrietta dated October 9th, No. 42. It is possible that I bought that ticket in Bowie on October 9th. If I went up there, I possibly did. I think that would be the evening of October 8th." (Statement of Facts, p. 139.) Again, he said: "The reason why I bought a ticket at Bowie on the night of October 8th, or morning of October 9th, to Henrietta was, well, with the intention, I suppose, of coming to Henrietta, but I found that I did—I thought, what is the use of coming up to Henrietta. I have nothing to do there. I might as well go back to Fort Worth, and I was to be at Bridgeport Sunday anyhow. I changed my mind." (Statement of Facts, p. 140.) It is a very significant fact that he did not buy nor use any ticket that night from Bowie back to Fort Worth. For his stubs show the next ticket he bought was on the morning of October 10th, from Ringgold to Bridgeport.

No statement of any of the testimony or the inference to be clearly drawn therefrom in the original opinion was placed therein because of any inadvertence. They are based unquestionably on the testimony introduced on this trial, after a most thorough and careful study of it. The testimony about what he paid for the old schoolhouse, what he is shown to have stated was its value, with the changes that he had made on it and the value with the improvements placed on it, was an accurate statement from the testimony itself and not a single statement in the original opinion in that connection but which was borne out strictly by the testimony. Mr. Squires swore positively that appellant did not make any representations whatever to him at the time he issued the $2500 policy that there was any other insurance upon the building, and that he knew nothing about any additional insurance on the building until months after the fire, and learned that from another and not from appellant. The policy that Mr. Squires issued was dated on *March 1, 1913.* The $3000 and $5000 policies issued by the Catholic Mutual Relief Society were not issued until *March 19, 1913.* It is true that appellant swore that he did tell Mr. Squires at the time Squires issued his $2500 policy that he had this other insurance of $3000 and $5000. The policy Squires issued was *issued and dated on March 1, 1913.* The said two policies of $3000 and $5000 issued by said relief society *were not issued and dated until nineteen days later, March 19, 1913.* (Statement of Facts, p. 206.)

There is nothing else necessary to be discussed as to appellant's motion for rehearing. It is overruled.

*Overruled.*

DAVIDSON, JUDGE, not present at consultation.

HARPER, JUDGE (concurring).—I have very thoughtfully studied this record, and deeming the letters dated August 17, 1914, and January 15, 1915, inadmissible, I have been at some difficulty in arriving at a conclusion in the premises. The court, in his qualification to the bills,

says the only objections offered were made when the district attorney was cross-examining appellant in regard to these two and the other letters in evidence; that subsequently counsel for appellant offered, at least the letters bearing on the expenditures, and after this the district attorney read all the letters, including the above two, and no objection was made at that time by appellant to the introduction of these two letters. If the bills showed that an objection was then made, we might feel inclined to sustain appellant's contention, but the court says none was then made, and as appellant accepted the bills as thus qualified, we must so conclude, and under such circumstances the objection made at the time of cross-examination could not be made to relate to the time when later they were read to the jury without objection.

Another matter to which the writer has not heretofore, and can not now, give his full concurrence is, that if the letters were inadmissible, as appellant received the lowest punishment, their introduction over objection would not be ground for reversal. The letters themselves could not and would not have any tendency to show that appellant burned the house, but the language in the letters might prejudice a Protestant jury against appellant, and if so they would give but little credence to his testimony, and upon his testimony he relied to create at least a doubt in the minds of the jury as to his guilt. However, the writer's views have not heretofore prevailed, and he believes in one rule of law for all. In the case of Miller v. State, from Travis County, decided last week, the court in the opinion admitted the testimony in that case was improperly admitted, and that it was prejudicial, but inasmuch as the jury assessed the lowest penalty, they would not disturb the verdict. The writer dissented most vigorously, but if that is to be the rule of decision of this court, if the objection had been urged when the letters were offered in evidence (which the court says was not done) the error would not be reversible, as appellant received the minimum punishment. See Miller v. State, 185 S. W. Rep., 29 (recently decided) and authorities cited. Under the rule in that case, this case should also be affirmed, considering the bills as ample to present the question.

DAVIDSON, JUDGE, not present at consultation.

April 12, 1916.

DAVIDSON, JUDGE (dissenting).—The State relied, first, upon the fact that Mrs. Flannigan recognized, or thought she did, appellant in the town of Henrietta on the evening prior to the burning of the house at night. This recognition was not by his face but by his general manner and dress, he being some distance from her walking along the street. The first time she recognized him was in the early evening, and the second time late in the evening. No other witness was produced who saw defendant or was aware of his presence in Henrietta,

the town in which the house was burned. Her testimony was sought to be reinforced by circumstances growing out of railroad tickets which were used, or supposed to have been, by appellant, covering some days before and just after the alleged burning. It is unnecessary for what I have to say to enter into a statement of these different transactions. The State also sought to reinforce its side by showing appellant had made different statements as to his whereabouts on the night of the alleged burning of the house. There are explanations offered by him, and the main ticket used, by the State known as No. 42, in such a way that it amounted to but little, if anything, as evidence to show his presence in Henrietta on that particular night. The changes on the ticket rendered it fully doubtful on the part of the conductor, who testified about taking up that ticket, as to whether he did in fact take it up that night, and whether appellant rode on his train that particular night. The State's theory was that if he rode on that particular ticket he could have been in Henrietta on the morning of the 9th, the house being burned on the night of the 9th. Appellant met this by proving a complete alibi by various and sundry witnesses as well as by his own testimony. Three witnesses, for instance, locate him at Fort Worth at the time of the alleged burning, he leaving Fort Worth about the hour or little before the house was burned at Henrietta, and going thence to Bridgeport, in Wise County, on that night, reaching there about 10 o'clock. His presence at that place at that time was proved not only my himself but by other witnesses who lived in Bridgeport. I do not care to go into the details of the evidence.

While appellant, who is a Catholic priest, was being interrogated letters were introduced by the State over the objection of appellant. There are several of these bills of exception, but one will be enough to illustrate what I have to say about it, known as bill of exceptions No. 1. It recites:

"Be it remembered, That upon the trial of the above styled and numbered cause, and while the State of Texas, through her district attorney, was offering the testimony in chief upon the trial of said cause, the district attorney offered in evidence the following letter, towit:

" 'Henrietta, Texas, August 17th, 1914.

" 'Mr. C. W. Martin, Omaha, Neb.

" 'Dear Sir: Enclosed you will find a check, $25.00, the balance due on the insurance policy of our school. I have had great difficulty with our school in order to get it on a running basis, and hope by the first of November to be able to have a good little school for our children. I have a great obstacle to contend with, or we few Catholics have here, as we are surrounded by Protestant bigots and they seem to hate a Catholic school, and have done all in their power to check us. However, I hope with God's grace and help we will be able to overcome this prejudice.

" 'Thanking you for the favors you have extended us, and with best wishes, I am,

(Ex. No. 45.)                              Yours in X D,

Henrietta, Texas, Box 273.                      Rev. Philip J. Kline.'

"And thereupon, and at the time said letter was offered in evidence, the defendant's counsel then and there in open court objected to the introduction of said letter and especially that part which reads as follows: 'I have a great obstacle to contend with, or we few Catholics have here, as we are surrounded by Protestant bigots and they seem to hate a Catholic school, and have done all in their power to check us.' First, because the same was wholly irrelevant and immaterial. Second, because said letter did not prove or tend to prove any issue in this case. Third, because the same was highly prejudicial to the rights of the defendant. And the court overruled each and all of said objections, and permitted the district attorney to read in evidence and in the presence and hearing of the jury trying this said cause, said letter. To which action and ruling of the court in overruling said objections and permitting said letter to be read to and in the presence and hearing of the jury trying this said cause, the defendant then and there in open court duly and legally excepted, and here now tenders this his bill of exceptions No. 1, and asks that the same be approved. signed and ordered filed as a part of the record herein."

This bill of exceptions is thus qualified by the court: "The objections urged in this bill were made at the time the district attorney was reading said letter to the defendant on cross-examination, while said defendant was testifying in his own behalf, and before said letter had been offered in evidence by the State; before said letters, including this one, was offered in evidence the following proceedings were had, while the defendant was still testifying in his own behalf on redirect examination by Hon. R. E. Taylor, attorney for defendant: Mr. Taylor, after interrogating the defendant about the amount of improvements he had placed on the burned building, asked the following questions: Q. State whether or not you now say, since you have gone over and read these letters, about what you would say was the amount of money in the aggregate, that you spent on this building. A. I would figure between $2500 and $3000. Mr. Taylor: I want to offer in evidence the letters you read here." Here the court further stated: "It is claimed by counsel for defendant that this offer was made for the purpose of showing his expenditures on the building only; and I accept his version of his offer. Said letters, including the one here in question, were thereupon offered in evidence, and read to the jury by district attorney. This qualification applies also to all the other letters introduced."

The grounds of objections urged in the bill, as will be seen from an inspection of it, and especially to that part of it which reads as follows: "I have a great obstacle to contend with, or we few Catholics have here, as we are surrounded by Protestant bigots and they seem to hate a

Catholic school, and have done all in their power to check us," are, first, the same was wholly irrelevant and immaterial; second, said letter did not prove or tend to prove any issue in this case; third, the same was highly prejudicial to the rights of the defendant. I have set out the bill fully so that the matters can be seen as verified in the bill.

The bill of exceptions was disposed of in the opinion mainly upon the ground that it was wholly insufficient to present the issue, and that it did not sufficiently state the matters to authorize a consideration of the bill. To this I can not agree. Usually when the grounds of objection state that it was irrelevant and immaterial, it may be considered in the light of a general demurrer, and if in the light of such objection the testimony is admissible for any purposes, the objection might not be sufficient. But if the evidence was not admissible for any purpose on the trial, then the general demurrer is sufficient. It is useless to cite authorities, I think, upon this proposition, but I will cite Branch's Crim. Law, secs. 45, 46 and 49. On the second proposition, that it did not prove or tend to prove any issue in the case, it will only be considered in the light of the bill itself. If this objection is well taken to the matters set forth in the bill itself, it would be sufficient. Whatever may be contained in the bill, if upon an inspection of it it does not prove or tend to prove any issuable fact, then such objection is sufficient. Taking the bill as it is presented, I do not understand how the fact that this letter contained the expressions referred to, that he was surrounded by Protestant bigots, or the Catholics of the town were surrounded by Protestant bigots, could possibly prove any issue in a case of burning a house for the insurance on it, as far as appellant is concerned. I believe this exception is good under the statements of the bill itself. As to the third ground, it will not be questioned the letter was of a very prejudicial nature. As a general proposition, a bill should be sufficiently full and certain in its statements so that in and of itself it will disclose what is necessary to show the supposed error. Mr. Branch collates numerous authorities in section 45 of his Criminal Law supporting this proposition. In section 46 of his Criminal Law he condenses the law forcefully that bills of exception to testimony will not be held defective for failure to state what objection was made, if the testimony is obviously hurtful and inadmissible for any purpose, citing Bell v. State, 2 Texas Crim. App., 220; Guajardo v. State, 24 Texas Crim. App., 605; Tyson v. State, 14 Texas Crim. App., 391. Objection to *evidence admitted,* that it was immaterial and irrelevant, is too general to be considered unless obviously the evidence would not be admissible for any purpose. He cites a great number of cases, commencing with McGrath v. State, 35 Texas Crim. Rep., 422, down to and including Lamb v. State, 55 Texas Crim. Rep., 325.

Sometimes a statement of facts will be looked to in aid of a bill of exceptions, but that phase of it is not here discussed. Some cases deal with the question as to whether or not the bills are sufficient, and in this connection authorizes a reference to the statement of facts to explain, verify or make plain the difference between the bill of excep-

tions as given by the court and that taken by bystanders. This bill was not taken by bystanders, but was given by the court and qualified as above stated. The court certified the statement that the defendant offered certain letters which speak of the amount of improvements put upon the property by appellant. This letter had nothing to do with that matter and in no way referred to expenses as do some of the letters mentioned in bills of exception. But it will be noted that appellant did not read any of the letters to the jury; he simply offered them as stated. If the bill of exceptions had shown they were *offered* but *failed to show* they were read in evidence before the jury, the bill of exceptions would not have been sufficient to show that they were introduced. The authorities are clear upon that proposition, at least since Burke v. State, 25 Texas Crim. App., 172. The court in his qualification says defendant *offered* no letters but *those which referred to the amount of improvements placed upon the property by appellant.* These appellant did not introduce in evidence. This letter does not refer to those and had nothing to do with them. The judge certified that fact. That this testimony was damaging and hurtful would hardly be a question or subject of debate. It was not withdrawn from the jury, therefore no question is presented from that standpoint vel non. The writer has heretofore stated and now states that he has not been in harmony with his associates upon the question of explicitness in bills of exception. His view is and has been if a bill is sufficient to present the supposed error so the court may understand the proposition asserted in it and can pass upon it, that the bill is sufficient, and that it is not necessary to repeat all the evidence which explains in detail the particular point. It is the opinion of the writer that this bill of exceptions is amply sufficient and full to show and manifest that the testimony introduced in the letter which is set out was not authorized. It had no application whatever to any improvements made by appellant upon the property, but was merely intended to get before the jury and did get before them the prejudicial matter, that he was surrounded by what he termed Protestant bigots, or the few Catholics who were there were so surrounded. That this could find no place in the trial of this case ought not to be debatable. I want to say further that whatever may have been the old rule with reference to the explicitness of a bill of exceptions, before the Legislature enacted what is known as the stenographer's law, ought not now to obtain. Prior to that time the lawyers of the case made up the statement of facts from memory without stenographic aid. The Legislature has provided that a stenographer shall be employed and sworn as an officer of the court; that he shall be fully qualified, and that he shall take down everything that occurs during the trial and make a transcript of the matters occurring on the trial. In this case the stenographer did so. He certifies at the end of the transcript that this was a correct statement of facts and matters occurring on the trial. The judge so certifies, and the attorneys on both sides so agree. The writer wishes to emphasize the fact where now under this stenographer's law these matters occur, that wherever the

stenographic report is signed and approved by the judge and the attorneys in the case, and verified by the stenographer, that its contents should not be permitted to be contradicted by the qualification to a bill of exceptions. If the bill of exceptions is not sufficient, it may be that it would be proper to qualify the bill so as to make the matter plain, but that qualification, whatever it may be, must be in accordance with the stenographic report of the trial made by the sworn officer, and especially so when that record is approved by the court and the attorneys on both sides. So from any viewpoint the writer is of the opinion that this bill is amply sufficient to manifest error, and the objections are sufficient. So far as this bill is concerned we need go no further than the face of the bill itself. It is not necessary to go to the stenographic report to ascertain this fact. In this connection I. desire to say further that two propositions ought not to be controverted, or at least seem to be well settled; that where the errors complained of conduce to bring about an erroneous conviction, or concede the guilt of the party, that it brought an enhanced punishment, it is reversible. In the attitude of this testimony and the more than serious doubt as to whether the defendant was in town at the time of the burning, but that he was in Fort Worth, or en route to Bridgeport, this character of testimony contained in this and some of the other letters is of sufficient importance to turn the jury against appellant. It was not withdrawn, but remained with and was considered by the jury. In this connection one other fact I desire to state. This house was burned on the night of the 9th, about dusk or dark, which was Friday. On the previous Tuesday the same house was set on fire by somebody. This was a Catholic schoolhouse in Henrietta. It was proved beyond question, if not a conceded fact, that appellant was not in Henrietta on Tuesday night when the house was first sought to be burned, but was in Wichita Falls. It was a serious question, met by evidence both ways, that he did not return to Henrietta until after the second burning, and, therefore, could not have been guilty of the second burning. Someone else set the house on fire the first time. It was not defendant. This character of testimony set forth in this letter may have induced the jury to find appellant guilty. We can not tell in cases of this character just what may or may not influence a jury. From any viewpoint this testimony was clearly inadmissible, and the writer believes that the bill of exceptions is ample under the authorities, and especially under the present law, to manifest error without reference to the statement of facts. If we were permitted to go to the statement of facts it would not show the defendant even offered any of these letters in evidence, but the State did, and it is shown by the bill of exceptions it was introduced by the State as original evidence. The bill of exceptions shows the State of Texas was offering this testimony in chief on the trial of the case and this letter was read as evidence.

It is unnecessary to discuss the other letters in view of what has been stated. They are signed by the judge and qualified in the same manner as was the bill already discussed.

I can not agree altogether with the statement made as to some of the evidence introduced. As I understand the original opinion, it indicates that the evidence shows that the property at the time of the alleged burning was only worth $2500. I think this was an inadvertence. I think the testimony will show conclusively that at the time appellant bought it it was worth $2500, and the witness does not state what it was worth at the time appellant offered to sell him the property, but stated that quite a lot of improvements had been made on the building after purchase in order to make it suitable for a school building, and appellant offered a State's witness the property at the time for $6000 or $6600, appellant stating also at the time he was willing to make some sacrifice on it. This was a physician who was speaking of buying it for some purpose connected with his practice,. but the trade was not consummated.

At the time the insurance was granted through the county insurance agent, Mr. Squires, Squires testified that appellant did not inform him that he had taken out insurance in another company. Appellant says he did so inform him, and told him the name of the company and incidental matters, and this in the presence of Mr. Wantland. So it was not a conceded fact but a decidedly contested issue as to whether appellant did or did not make the statement to Squires at the time he took out the insurance in the company represented by Mr. Squires. Wantland was not introduced as a witness, therefore we have got the issue between the testimony of Squires and that of appellant as to this matter. I do not care to pursue this matter further. I am of the opinion upon a review of the case and reading of the record, bills of exception and statement of facts, that these matters were of such an erroneous nature as requires a reversal of the judgment and awarding appellant another hearing before a jury. To this end I believe the. affirmance should not have occurred, the rehearing ought to be granted, and the judgment reversed.